**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

------------------------------------------------------------------------------x

D.H., a minor, by her next friends A.H., mother, and
E.H., father,

Plaintiff,

v.

WILLIAMSON COUNTY BOARD OF
EDUCATION; JASON GOLDEN, in his official
capacity as Director of the Williamson County
Schools; THE TENNESSEE DEPARTMENT OF
EDUCATION; and PENNY SCHWINN, in her
official capacity as Commissioner of the Tennessee
Department of Education,

Defendants.

Case No. 22-cv-00570

------------------------------------------------------------------------------


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 3

    A.    The School Facilities Law ................................................................................. 3

    B.    Sex, Gender Identity, and the Unique Risks Transgender Children Face ................... 5

    C.    D.H. is a Transgender Girl who will be Starting the Third Grade this Year .............. 8

        1.    D.H. is a Transgender Girl ................................................................. 8

        2.    D.H.'s Second Grade Experience at The Elementary School ........................... 9

        3.    D.H. will be Entering the Third Grade this Fall ................................................ 11

LEGAL STANDARD ................................................................................................ 11

ARGUMENT ........................................................................................................... 12

I.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HER CLAIMS ............. 12

    A.    Plaintiff is Likely to Succeed on Her Title IX Claim ............................................. 12

    B.    Plaintiff is Likely to Succeed on Her Equal Protection Claim ................................. 16

        1.    The School Facilities Law is not Substantially Related to Protecting Student Privacy .................................................................................... 18

        2.    The School Facilities Law is not Substantially Related to Protecting Student Safety ..................................................................................... 20

II.    PLAINTIFF WILL SUFFER SIGNIFICANT IRREPARABLE HARM WITHOUT INJUNCTIVE RELIEF ........................................................................................ 21

III.    THE BALANCE OF HARDSHIPS WEIGHS IN PLAINTIFF'S FAVOR ...................... 23

IV.    THE PUBLIC INTEREST STRONGLY FAVORS GRANTING A PRELIMINARY INJUNCTION .................................................................................................... 24

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*,
No. 1:21-CV-02965-TWP-MPB, 2022 WL 1289352 (S.D. Ind. Apr. 29,
2022), *appeal docketed*, No. 22-1786 (7th Cir. May 3, 2022) .......................................2, 14, 19

*Adams v. Sch. Bd. of St. Johns Cnty., Fla.*,
3 F.4th 1299 (11th Cir. 2021) .........................................................................................1

*Adams v. Sch. Bd. of St. Johns Cnty., Fla.*,
9 F.4th 1369 (11th Cir. 2021) .........................................................................................2

*B.E. v. Vigo Cnty. Sch. Corp.*,
No. 2:21-CV-00415-JRS-MG, 2022 WL 2291763 (S.D. Ind. June 24, 2022) .............2, 14, 19

*B.P.J. v. W. Va. State Bd. of Educ.*,
550 F. Supp. 3d 347 (S.D. W. Va. 2021) ......................................................................15

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*,
208 F. Supp. 3d 850 (S.D. Ohio 2016) ........................................................... *passim*

*Bernal v. Fainter*,
467 U.S. 216 (1984) .......................................................................................................17

*Bongo Prods., LLC v. Lawrence*,
548 F. Supp. 3d 666 (M.D. Tenn. 2021) ..............................................................5, 18, 24

*Bongo Prods., LLC v. Lawrence*,
No. 3:21-CV-00490, 2022 WL 1557664 (M.D. Tenn. May 17, 2022) ...........................5, 18

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020) ............................................................................................13, 14

*Brown v. Bd. of Educ.*,
347 U.S. 483 (1954) .......................................................................................................16

*Carcaño v. McCrory*,
203 F. Supp. 3d 615 (M.D.N.C. 2016) ............................................................................2

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) .......................................................................................................24

*Cohen v. Brown Univ.*,
991 F.2d 888 (1st Cir. 1993) .........................................................................................25

ii

*Cruzan v. Special Sch. Dist. # 1*,
   294 F.3d 981 (8th Cir. 2002) ...............................................20

*Dodds v. U.S. Dep't of Educ.*,
   845 F.3d 217 (6th Cir. 2016) ..................................... *passim*

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.*,
   897 F.3d 518 (3d Cir. 2018)....................................1, 8, 19

*Doe v. Claiborne Cnty.*,
   103 F.3d 495 (6th Cir. 1996) ...............................................13

*Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
   884 F.3d 560 (6th Cir. 2018) ...............................................13

*Evancho v. Pine-Richland Sch. Dist.*,
   237 F. Supp. 3d 267 (W.D. Pa. 2017)....................19, 22, 25

*FemHealth, USA, Inc. v. City of Mount Juliet*,
   458 F. Supp. 3d 777 (M.D. Tenn. 2020)............................25

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
   503 U.S. 60 (1992).................................................................13

*Fuhr v. Hazel Park Sch. Dist.*,
   710 F.3d 668 (6th Cir. 2013) ...............................................13

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir.), *as amended* (Aug. 28, 2020) *cert. denied*, 141 S. Ct.
   2878 (2021) ............................................................ *passim*

*I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*,
   No. 3:19-CV-00981, 2019 WL 6050283 (M.D. Tenn. Nov. 15, 2019)...................11

*J.A.W. v. Evansville Vanderburgh Sch. Corp.*,
   323 F. Supp. 3d 1030 (S.D. Ind. 2018)........................ *passim*

*Jones v. Caruso*,
   569 F.3d 258 (6th Cir. 2009) ...............................................24

*Legatus v. Sebelius*,
   988 F. Supp. 2d 794 (E.D. Mich. 2013).............................23

*Moltan Co. v. Eagle-Picher Indus., Inc.*,
   55 F.3d 1171 (6th Cir. 1995) ...............................................25

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) .........................................11, 12

iii

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999)................................................................................................13

*Parents for Priv. v. Barr*,
    949 F.3d 1210 (9th Cir.), *cert. denied*, 141 S. Ct. 894 (2020)......................................1, 19, 20

*Smith v. City of Salem, Ohio*,
    378 F.3d 566 (6th Cir. 2004) ....................................................................................12, 13

*Sullivan v. Benningfield*,
    920 F.3d 401 (6th Cir. 2019) ....................................................................................16

*Tennessee v. U.S. Dep't of Educ.*,
    No. 3:21-CV-308, 2022 WL 2791450 (E.D. Tenn. July 15, 2022) ........................................14

*Tumminello v. Father Ryan High Sch., Inc.*,
    678 F. App'x 281 (6th Cir. 2017)...............................................................................13

*United States v. Virginia*,
    518 U.S. 515 (1996)................................................................................................16, 17

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017), *abrogated on other grounds by Ill. Republican
    Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) .............................................................. *passim*

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    No. 16-CV-943-PP, 2016 WL 5239829 (E.D. Wis. Sept. 22, 2016).........................................2

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................................11

## **STATUTES**

20 U.S.C. § 1681 .................................................................................................. *passim*

29 U.S.C. § 794....................................................................................................10

42 U.S.C. § 1983...................................................................................................13

Tenn. Code Ann. § 49-2-801 ..................................................................................... *passim*

Tenn. Code Ann. § 49-2-802 ......................................................................................3, 15

Tenn. Code Ann. § 49-2-803 ......................................................................................3

Tenn. Code Ann. § 49-2-805 ......................................................................................4, 17

Tenn. Code Ann. § 49-6-310 ......................................................................................4

Tenn. Code Ann. § 49-6-1301 ...............................................................................4

Tenn. Code Ann. § 49-6-1308 ...........................................................................4, 5

Tenn. Code Ann. § 63-1-169 .................................................................................4

Tenn. Code Ann. § 68-120-120 .............................................................................5

**OTHER AUTHORITIES**

34 C.F.R. § 104.33 ...............................................................................................10

Am. Acad. of Pediatrics, *American Academy of Pediatrics Opposes Legislation
    that Discriminates Against Transgender Children* (May 1, 2016),
    https://www.aapdc.org/2016/05/01/american-academy-of-pediatrics-opposes-
    legislation-that-discriminates-against-transgender-children/.....................................7

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*
    (5th ed. 2022) .................................................................................................6, 9

Brian S. Barnett et al., *The Transgender Bathroom Debate at the Intersection of
    Politics, Law, Ethics, and Science*, 46 J. Am. Acad. Psychiatry & L. 232 (Nov.
    2, 2018), http://jaapl.org/content/jaapl/46/2/232.full.pdf.......................................23

Daniel Trotta, *U.S. Transgender People Harassed in Public Restrooms:
    Landmark Survey*, Reuters (Dec. 8, 2016), https://www.reuters.com/article/us-
    usa-lgbt-survey/u-s-transgender-people-harassed-in-public-restrooms-
    landmark-survey-idUSKBN13X0BK ...................................................................23

David A. Levine, *Office-Based Care for Lesbian, Gay, Bisexual, Transgender,
    and Questioning Youth*, 132 Pediatrics e297 (July 2013),
    https://pediatrics.aappublications.org/content/pediatrics/132/1/e297.full.pdf.........5

Eli Coleman et al., *Standards of Care for the Health of Transsexual, Transgender,
    and Gender-Nonconforming People*, World Prof'l Ass'n for Transgender
    Health 15 (7th Version 2012),
    https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_Engl
    ish2012.pdf?_t=1613669341 ...................................................................................7

*Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth*, Substance
    Abuse and Mental Health Servs. Admin. 16 (2015),
    https://store.samhsa.gov/sites/default/files/d7/priv/sma15-4928.pdf.......................5

Eric Yarbrough et al, *Gender Dysphoria Diagnosis*, Am. Psychiatric Ass'n (2017),
    https://www.psychiatry.org/psychiatrists/cultural-
    competency/education/transgender-and-gendernonconforming-
    patients/gender-dysphoria-diagnosis.......................................................................6

Gabriel Murchison et al., *School Restroom and Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, 143 J. Am. Academy of Pediatrics 1 (2019) ................................................................................................20

Jack Drescher et al., *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals*, Am. Psychiatric Ass'n Official Actions 1 (July 2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf ...........................6

Joseph G. Kosciw et al., *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN xxi (2020), https://www.glsen.org/sites/default/files/2020-10/NSCS-2019-Full-Report_0.pdf .................................................................................................8

Kristie L. Seelman, *Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality*, 63 J. Homosexuality 1378 (2016), https://scholarworks.gsu.edu/cgi/viewcontent.cgi?article=1065&context=ssw_facpub ......................................................................................................8

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390 (proposed July 12, 2022) (to be codified at 34 C.F.R. part 106) ....................................................14

*Resolution on Gender and Sexual Orientation Diversity in Children and Adolescents in Schools*, Am. Psychiatric Ass'n 1 (2015), https://www.apa.org/about/policy/orientation-diversity ........................................8

Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equality 134 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf ..............................................................................................................7

Stephen T. Russell et al*., Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. Adolescent Health 503, 505 (2018), https://pubmed.ncbi.nlm.nih.gov/29609917 ......................................................17

*Tennessee Accommodations for All Children Act*, H.B. 1233 Before the House Floor Sess. - 25th Legislative Day, https://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24699 ...................17, 18

U.S. Const. .............................................................................................................1, 16

Williamson County Schools, *Title IX Prohibits Sexual Harassment and Sexual Violence in Public Schools* (last visited Aug. 1, 2022), https://www.wcs.edu/domain/1395............................................................................................15

*Williamson County Schools, Year-to-Date Budget Report* 3 (June 1, 2022), https://meeting.boeconnect.net/Documents/WebViewer/566?file=bf8ba32b-8400-43c4-9c61-9772da006a6e................................................................................................14

# INTRODUCTION

Plaintiff D.H.[1] is an 8-year-old transgender girl who will begin third grade at a public elementary school (the "Elementary School") in Williamson County, Tennessee on August 5, 2022. She brings the present suit challenging the "Tennessee Accommodations for All Children Act," Tenn. Code Ann. § 49-2-801, *et seq.* (the "School Facilities Law" or "Law"), which bans transgender public-school students like her from accessing restrooms and other facilities consistent with their gender identities.[2]

By singling out transgender students for disfavored treatment and explicitly writing discrimination against transgender people into State law, the School Facilities Law violates the most basic guarantees of equal protection under the U.S. Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"). Indeed, the overwhelming majority of federal appellate courts to have considered a law or policy like the School Facilities Law, including the Sixth Circuit, have found that it violates Title IX, the Equal Protection Clause, or both. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir.), *as amended* (Aug. 28, 2020) *cert. denied*, 141 S. Ct. 2878 (2021); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), *abrogated on other grounds by Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016).[3]

---

[1]     Plaintiff is simultaneously filing a Motion to Proceed Pseudonymously to request permission for her and her parents to use pseudonyms in this action to protect D.H.'s identity.

[2]     While the School Facilities Law applies to students, teachers, and employees, Plaintiff's Complaint and this Motion focus specifically on the student population since Plaintiff is a student.

[3]     *See also Parents for Priv. v. Barr*, 949 F.3d 1210 (9th Cir.), *cert. denied*, 141 S. Ct. 894 (2020) (holding trans-inclusive school restroom policy does not violate constitutional right to privacy or Title IX); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018) (same). Additionally, the Eleventh Circuit Court of Appeals has held that a school policy barring a transgender student from the restroom corresponding with his gender identity violates the Constitution's guarantee of equal protection. *See Adams v. Sch. Bd. of St. Johns Cnty., Fla.*, 3

Through the present motion, Plaintiff seeks a preliminary injunction enjoining Defendants from depriving her of her constitutional and statutory rights for equal access to the Elementary School's educational programs during the pendency of this litigation. Plaintiff attended the Elementary School for half of last year and was forced to live under the indignity of being stigmatized by the Law and isolated from and ostracized by her peers. This caused her great distress and anxiety, leading to mental, emotional, and physical consequences. Numerous courts have granted preliminary injunctive relief to similarly situated plaintiffs bringing virtually identical claims. *See, e.g.*, *B.E. v. Vigo Cnty. Sch. Corp.*, No. 2:21-CV-00415-JRS-MG, 2022 WL 2291763 (S.D. Ind. June 24, 2022); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, No. 1:21-CV-02965-TWP-MPB, 2022 WL 1289352 (S.D. Ind. Apr. 29, 2022), *appeal docketed*, No. 22-1786 (7th Cir. May 3, 2022); *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F. Supp. 3d 1030 (S.D. Ind. 2018); *Carcaño v. McCrory*, 203 F. Supp. 3d 615 (M.D.N.C. 2016); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, No. 16-CV-943-PP, 2016 WL 5239829 (E.D. Wis. Sept. 22, 2016).

As such, Plaintiff is likely to succeed on the merits of her claims and will suffer irreparable harm absent preliminary relief. Further, Defendants will not suffer any harm by permitting Plaintiff to use the restroom corresponding with her gender identity, and the public interest will be served by preventing the enforcement of a discriminatory and unconstitutional law. Accordingly, Plaintiff respectfully requests that the Court grant a preliminary injunction enjoining Defendants from enforcing the School Facilities Law and permitting Plaintiff to use the school facilities corresponding with her gender identity, at least until such time as further injunctive relief or final

---

F.4th 1299, 1306 (11th Cir. 2021). Since that time, the Eleventh Circuit has vacated that decision, and voted to rehear the case *en banc*. *See Adams v. Sch. Bd. of St. Johns Cnty., Fla.*, 9 F.4th 1369, 1372 (11th Cir. 2021). No decision has yet been issued *en banc*.

2

judgment is entered in this case.

FACTUAL BACKGROUND

A.      **The School Facilities Law**

In May 2021, Tennessee enacted the School Facilities Law, which restricts transgender students (among others) from using the multi-occupancy restrooms and locker rooms at school that align with their gender identity.  The Law operates by requiring public schools, "to the extent practicable," to provide a "reasonable accommodation" to a student, teacher, or employee who "[d]esires greater privacy [1] when using a multi-occupancy restroom or changing facility designated for [their] sex and located within a public school building, or [2] when using multi-occupancy sleeping quarters designated for [their] sex while [they are] attending a public school-sponsored activity."  Tenn. Code Ann. § 49-2-803.

The School Facilities Law then mandates that a "reasonable accommodation" "includes, but is not limited to, access to a single-occupancy restroom or changing facility or use of an employee restroom or changing facility."  *Id.* § 49-2-802(2).  Expressly excluded from this definition, however, is any "[a]ccess to a restroom or changing facility that is designated for use by members of the opposite sex while members of the opposite sex are present or could be present."  *Id.* § 49-2-802(2)(A).

The School Facilities Law strictly defines "sex" to mean "a person's immutable biological sex as determined by anatomy and genetics existing at the time of birth.  Evidence of a person's biological sex includes, but is not limited to, a government-issued identification document that accurately reflects a person's sex listed on the person's *original* birth certificate."  *Id.* § 49-2-802(4) (emphasis added).  This narrow definition of "sex" obviates even the amending of birth certificates to reflect an individual's gender identity.

3

Finally, the School Facilities Law provides students (as well as their parents or legal guardians), teachers, and employees a private right of action to sue public school systems for "psychological, emotional, and physical harm," including monetary damages and "reasonable attorney fees and costs," if they encounter a transgender person in a multi-occupancy restroom or changing facility at a school that has "intentionally allowed a member of the opposite sex to enter the multi-occupancy restroom or changing facility while other persons were present." *Id.* § 49-2-805.

Thus, the "reasonable accommodation" purportedly provided in the Law is no accommodation at all. Instead, it forces transgender students into the unenviable position of either using the multi-occupancy restrooms designated for the gender opposite of their actual identity, or else being singled out and relegated to single-occupancy facilities apart from their peers. Further, the School Facilities Law provides students with no means to rectify or clarify their gender for school purposes, and institutes a draconian private bounty-hunting scheme to keep students and schools in line.

The School Facilities Law is one of a series of bills targeting transgender people recently enacted by Tennessee, including laws: (1) preventing transgender students from participating in high school and middle school sports, *see* Tenn. Code Ann. § 49-6-310;[4] (2) preventing physicians from prescribing hormone treatment for prepubertal transgender youth, *see id.* § 63-1-169; (3) requiring public schools to notify parents before offering any curriculum about sexual orientation and gender identity, *see id.* §§ 49-6-1301 & 1308; and (4) requiring businesses with restrooms open to the public to post a notice at the entrance of each public restroom if the business allows

---

[4]     A case has recently been filed in this District challenging this law on constitutional and Title IX grounds. *See* Complaint, *L.E. ex rel. Esquivel v. Lee*, No. 3:21-cv-00835 (M.D. Tenn. Nov. 4, 2021).

transgender individuals to use the restrooms corresponding with their gender identity, *see id.* § 68-120-120.  Recently, a court in this District granted a permanent injunction enjoining enforcement of the last of these laws in *Bongo Productions, LLC v. Lawrence*, No. 3:21-CV-00490, 2022 WL 1557664 (M.D. Tenn. May 17, 2022).  In *Bongo Productions*, the court characterized the statute as "a brazen attempt to single out trans-inclusive establishments and force them to parrot a message that they reasonably believe would sow fear and misunderstanding about the very transgender Tennesseans whom those establishments are trying to provide some semblance of a safe and welcoming environment." *Id.* at *19.

**B.     Sex, Gender Identity, and the Unique Risks Transgender Children Face**

Gender identity refers to one's innate sense of belonging to a particular gender.  One's gender identity emerges at a young age and, by age four, "gender identity is stable." *See* David A. Levine, *Office-Based Care for Lesbian, Gay, Bisexual, Transgender, and Questioning Youth*, 132 Pediatrics e297, e299 (July 2013), https://pediatrics.aappublications.org/content/pediatrics/132/1/e297.full.pdf; *see also Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth*, Substance Abuse and Mental Health Servs. Admin. 16 (2015), https://store.samhsa.gov/sites/default/files/d7/priv/sma15-4928.pdf.  All people have a gender identity; for most, their gender identity conforms with their sex assigned at birth.  Transgender people, however, experience a gender identity that is incongruent with their assigned sex.  Courts in this District have recognized that "gender identity, as a type of internally experienced phenomenon, *exists* [and] is supported by both medical research and, at least for many people, confirmed by the ordinary experience of being a human." *Bongo Prods., LLC v. Lawrence*, 548 F. Supp. 3d 666, 674 (M.D. Tenn. 2021) (emphasis in original); *see also Bongo Prods., LLC*, 2022 WL 1557664, at *6-*8 (recounting evidence regarding biology and gender identity).

5

The American Psychiatric Association explains that being transgender is not an affliction to be fixed; it will not go away, and it "implies no impairment in [a person's] judgment, stability, reliability, or general social or vocational capabilities." Jack Drescher et al., *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals*, Am. Psychiatric Ass'n Official Actions 1 (July 2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf. Numerous other leading representatives of the healthcare community, including the American Academy of Pediatrics, the American College of Physicians, and the American Academy of Child and Adolescent Psychiatry, join in this consensus. *See, e.g.*, Brief of Amici Curiae Medical, Public Health and Mental Health Organizations in Support of Plaintiff-Appellee, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) (No. 19-1952, ECF No. 32-1) ("Academy of Pediatrics Amicus Br.").

Many, but not all, transgender people experience a condition known as "gender dysphoria," which the American Psychiatric Association recognizes as "the distress caused by the body and mind not aligning and/or societal marginalization of gender-variant people." Eric Yarbrough et al, *Gender Dysphoria Diagnosis*, Am. Psychiatric Ass'n (2017), https://www.psychiatry.org/psychiatrists/cultural-competency/education/transgender-and-gendernonconforming-patients/gender-dysphoria-diagnosis; *see also* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 511–520 (5th ed. 2022) ("DSM-5"). The international consensus throughout the healthcare community is that the appropriate treatment for gender dysphoria is to support the transgender person's social transition, so that they may live in accordance with their gender identity. This process of "transitioning" may take several forms, not limited to: counseling, use of a new name and pronouns, new clothes and hairstyles, and age-

6

Case 3:22-cv-00570   Document 6   Filed 08/02/22   Page 14 of 35 PageID #: 76

appropriate medical care such as puberty blocking medications, hormone therapy, and gender-confirming surgery. *See* Eli Coleman et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People*, World Prof'l Ass'n for Transgender Health 15-16, 18 (7th Version 2012), https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English2012.pdf?_t=16 13669341.

Failing to support transgender individuals in their transition has consequences. Transgender children are already more likely to experience bullying, harassment, and rejection from peers. The stress from such bullying and rejection is exacerbated by having to use a restroom that does not reflect the gender consistent with their sense of self and public identity, thereby forcing them to reveal their transgender status. *See* Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equality 134 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf. This involuntary outing of a person's transgender status is detrimental to their wellbeing because control over the circumstances of disclosure is fundamental to the development of individuality and autonomy. *See* Am. Acad. of Pediatrics, *American Academy of Pediatrics Opposes Legislation that Discriminates Against Transgender Children* (May 1, 2016), https://www.aapdc.org/2016/05/01/american-academy-of-pediatrics-opposes-legislation-that-discriminates-against-transgender-children/.

By contrast, "[t]ransgender children who live in accordance with their gender identity in all aspects of life have lower rates of depression compared to transgender children who have not socially transitioned." Academy of Pediatrics Amicus Br. at 14. Indeed, multiple studies have found that school policies and programs intended to prevent bullying of LGBTQ+ students reduce

rates of depression, suicidality, and other negative outcomes. *See Resolution on Gender and Sexual Orientation Diversity in Children and Adolescents in Schools*, Am. Psychiatric Ass'n 1, 3 (2015) (recommending that schools allow students "to have access to the sex-segregated facilities, activities, and programs that are consistent with their gender identity, including, but not limited to, bathrooms, locker rooms, sports teams, and classroom activities"), https://www.apa.org/about/policy/orientation-diversity. Schools with transgender-inclusive policies pose lower risks of harassment, violence, or anti-LGBTQ+ remarks at schools for their students. *See* Joseph G. Kosciw et al., *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN xxi–xxv (2020), https://www.glsen.org/sites/default/files/2020-10/NSCS-2019-Full-Report_0.pdf.

Forcing a transgender person to use a restroom that does not align with their gender identity can exacerbate gender dysphoria, leading to detrimental mental, emotional, and health consequences. *See* Kristie L. Seelman, *Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality*, 63 J. Homosexuality 1378, 1388–89 (2016) (finding that 60.5% of transgender college students who had been denied access to facilities corresponding to their gender had attempted suicide), https://scholarworks.gsu.edu/cgi/viewcontent.cgi?article=1065&context=ssw_facpub. In short, "[w]hen transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life-threatening." *Boyertown Area Sch. Dist.*, 897 F.3d at 529.

### C. D.H. is a Transgender Girl who will be Starting the Third Grade this Year

### 1. D.H. is a Transgender Girl

Plaintiff is an eight-year-old transgender girl entering the third grade this year at the Elementary School. She has long expressed a preference for assuming roles traditionally associated with girls, stating that she feels more of what it means to be a girl in her heart than a

boy. Compl. ¶¶ 32, 37. She began her social transition after kindergarten, in the spring of 2020, which means at that time, she began living in accordance with her gender identity as a girl in all aspects of her life. *Id.* ¶¶ 3, 46.

Currently, Plaintiff is diagnosed with adjustment disorder, which the DSM-5 describes as the development of emotional or behavioral symptoms in response to an identifiable stressor within three months of onset. *Id.* ¶¶ 2, 39; *see also* DSM-5 at 319–22. She has a long history of suffering from the mental and emotional stressors associated with being transgender, including being previously diagnosed with regurgitation—a psycho-social medical issue that caused Plaintiff to unintentionally vomit to ease her anxiety. *See* Compl. ¶¶ 33. She also has a significant history of being bullied, harassed, and misgendered for being transgender. *See id.* ¶¶ 51, 69–73, 77. Plaintiff's parents are concerned that if she is unable to live in conformity with her gender identity, she will develop gender dysphoria. *See* Declaration of A.H. in Support of Plaintiff's Motion for a Preliminary Injunction (hereinafter, "A.H. Decl.") ¶ 63; *see also* Compl. ¶ 82.

## 2. D.H.'s Second Grade Experience at The Elementary School

Plaintiff attended the Elementary School in-person from January to May 2022 for the second half of her second-grade year. Compl. ¶¶ 54–77. During this time, the School Facilities Law was in effect. *Id.* ¶ 57. As such, the Elementary School informed Plaintiff and her parents that Plaintiff was not allowed to use the girls' restroom, but, instead, would be forced to use single-occupancy restroom facilities. *Id.* ¶ 58.

Only four such facilities exist in the Elementary School, and each presents significant concerns. *Id.* ¶¶ 59–63. One of the restrooms was on the opposite side of the school from Plaintiff's second grade class, meaning D.H. would miss additional class time when having to use this restroom. Others were unhygienic and unavailable at unpredictable times, or located in places that forced her to out herself to staff who accused her of being in unpermitted areas of the school.

9

The final single-occupancy facility presents safety concerns because it is located outside the Elementary School's lockdown zone, meaning it is far from D.H.'s class and anyone from the public can use it. Plaintiff's parents fear for her safety when she uses this restroom. A.H. Decl. ¶ 38; *see also* Compl. ¶ 61.

Further, Plaintiff's parents asked the Elementary School that, as an accommodation and in accordance with D.H.'s 504 Plan,[5] Plaintiff's second-grade class not stop at the restrooms as a group. A.H. Decl. ¶ 42; *see* Compl. ¶ 65. Despite this, D.H.'s teachers often took the whole class, or parts of it, to the restrooms at once. When this happens, Plaintiff is the only student in her class who is forced out of the group to use a separate restroom facility from her peers, just because she is transgender.

Forcing Plaintiff to use separate restroom facilities ostracizes her from her peers and exacerbates her feelings of isolation and differentness. As a result, Plaintiff has been the victim of several instances of bullying and harassment, including being confronted by a group of boys on the playground, being repeatedly asked if she is "*really* a girl," and being punched repeatedly on the head at the bus stop while waiting to go to school by a student. *See id.* ¶¶ 70–71. In addition to the bullying and harassment, Plaintiff has been outed repeatedly by her classmates and teachers who frequently misgender her despite following the Elementary School's suggested approach in revealing herself as a transgender girl one-on-one to other students. *Id.* ¶¶ 50–52. When asking for support from her teachers in affirming her gender identity with her classmates, Plaintiff was

---

[5]     A 504 Plan is developed according to Section 504 of the Rehabilitation Act to ensure that a child with a qualifying disability attending an elementary or secondary educational institution receives accommodations to ensure the child's academic success and access to the learning environment. *See* 29 U.S.C. § 794; 34 C.F.R. § 104.33(a) (establishing that federally-funded schools "shall provide a free appropriate public education" to each qualifying disabled student.).

told that everyone is "allowed to have an opinion" by one of her teachers and has been labeled as "just confused" by another student's parents. *See* A.H. Decl. ¶. 23; Compl. ¶ 73.

Due to the lack of gender-affirming restroom options during the second grade, Plaintiff began limiting the amount she ate and drank at school to minimize the need to use the restroom during the day. *See* Compl. ¶ 68. At times, this resulted in Plaintiff suppressing her need to use the restroom for over eight consecutive hours. On at least one occasion, Plaintiff's mother had to pick her up from school because she was not using the restroom. *Id.* This had detrimental effects on Plaintiff, both mentally and physically. A.H. Decl. ¶¶ 50–57; Compl. ¶¶ 78–80. Plaintiff's parents are concerned that suppressing her natural need to use the restroom to feel comfortable at school will have deep psychological consequences. Plaintiff's behavior noticeably changed and she also suffered migraines, reflux, and recurring nightmares of school. Compl. ¶ 80. She has also begun to show signs of internalized transphobic thoughts. *Id.*

### 3. D.H. will be Entering the Third Grade this Fall

Plaintiff will begin third grade at the Elementary School on August 5, 2022. Plaintiff's parents are very concerned for both the immediate and long-term effects their daughter could suffer if she is not permitted to use the multi-occupancy girls' restrooms at the Elementary School—a privilege enjoyed by all of her non-transgender peers. *See id.* ¶ 82; A.H. Decl. ¶ 63.

## LEGAL STANDARD

A preliminary injunction is properly granted where the plaintiff demonstrates that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (same). These are "factors to be balanced, not prerequisites that must be met." *I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*,

No. 3:19-CV-00981, 2019 WL 6050283, at *3 (M.D. Tenn. Nov. 15, 2019). And where a party moves for a preliminary injunction "on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Husted*, 697 F.3d at 436.

## ARGUMENT

## I. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HER CLAIMS

### A. Plaintiff is Likely to Succeed on Her Title IX Claim

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To establish her Title IX claim, Plaintiff must show that: (1) she was excluded from participation in an education program because of her sex; (2) the educational institution received federal financial assistance at the time of the exclusion; and (3) the discrimination harmed her. *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 865 (S.D. Ohio 2016); *see also Grimm*, 972 F.3d at 616.

First, because the School Facilities Law precludes Plaintiff from using the multi-occupancy restrooms that comport with her gender identity, she is excluded from an education program for the purpose of Title IX and suffers discrimination on the basis of sex. As the Sixth Circuit has held, "[s]ex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575 (6th Cir. 2004). Accordingly, at least one District Court in the Sixth Circuit has concluded that "*Smith* . . . supports a reading that under Title IX[,] discrimination on the basis of a transgender person's gender non-conformity constitutes discrimination 'because of sex.'" *Highland*, 208 F. Supp. 3d at 869. In *Highland*—which is virtually indistinguishable from the

12

present case—the court granted a preliminary injunction requiring a school district to allow an eleven-year-old transgender girl to use the girls' restroom, holding that "[a]ccess to the bathroom is . . . an education program or activity under Title IX," and that the transgender student was likely to prevail on her Title IX claim because she was "denied access to the communal girls' restroom 'on the basis of [her] sex.'" *Highland,* 208 F. Supp. 3d at 865, 870. Notably, the Sixth Circuit denied the defendants' motion to stay the preliminary injunction issued in *Highland*, holding in relevant part that defendants were unlikely to succeed on the merits of their appeal in light of the "settled law in this Circuit," as established in *Smith*, that discrimination "based on a person's gender non-conforming behavior is impermissible." *Dodds*, 845 F.3d at 221. The Sixth Circuit later reaffirmed in *Equal Employment Opportunity Commission v. R.G. &. G.R. Harris Funeral Homes, Inc.*, that "discrimination on the basis of transgender status necessarily entails discrimination on the basis of sex." 884 F.3d 560, 578 (6th Cir. 2018).

The U.S. Supreme Court's recent decision in *Bostock v. Clayton County*, which affirmed the Sixth Circuit's decision in *Harris Funeral Homes*, further supports the conclusion that Plaintiff has suffered impermissible discrimination "on the basis of sex." 140 S. Ct. 1731, 1741 (2020) (noting that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex").[6] Indeed, in addition to *Highland*

---

[6] Although *Smith*, *Harris Funeral Homes*, and *Bostock* involved interpretation of Title VII, courts consistently interpret Title VII and Title IX in conformity. *See, e.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) (Thomas, J., dissenting) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX . . . ."); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992) (applying Title VII's conception of sexual harassment as sex discrimination to Title IX claim); *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 284 (6th Cir. 2017) ("[W]e turn to prior Title VII decisions to aid our interpretation of Title IX's 'on the basis of sex' requirement."); *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013) ("[T]he standards articulated by Title VII cases are sufficient to establish the applicable legal framework here."); *Doe v. Claiborne Cnty.*, 103 F.3d 495, 515 (6th

13

and *Dodds*, federal courts both pre- and post-*Bostock*, including several appellate courts, have held that excluding transgender students from using restrooms and related school facilities that comport with their gender identity is impermissible discrimination on the basis of sex under Title IX. *See Grimm*, 972 F.3d at 616–17 ("[T]he Board could not exclude Grimm from the boys' restrooms without referencing his 'biological gender' under the policy, which it has defined as the sex marker on his birth certificate . . . . Therefore, the Board's policy excluded Grimm from the boys [sic] restrooms 'on the basis of sex.'"); *Whitaker*, 858 F.3d at 1049 (requiring "an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX"); *see also B.E.*, 2022 WL 2291763, at *3–*5 (applying *Bostock* and *Whitaker*, holding plaintiff likely to succeed on Title IX claim challenging a school's exclusionary restroom policy); *A.C.*, 2022 WL 1289352, at *3–*6 (same); *J.A.W.*, 323 F. Supp. 3d at 1036-37 (same, pre-*Bostock*, applying *Whitaker*).[7]

Second, the School Board receives federal financial assistance and is under Title IX's mandate. *See Williamson County Schools, Year-to-Date Budget Report* 3 (June 1, 2022), https://meeting.boeconnect.net/Documents/WebViewer/566?file=bf8ba32b-8400-43c4-9c61-

---

Cir. 1996) ("[T]he elements to state a supervisory hostile environment claim under Title VII equally apply under Title IX."); *Highland*, 208 F. Supp. 3d at 868 & n.7.

[7]     Additionally, the Biden Administration, the U.S. Department of Education ("DOE"), and the Department of Justice have all issued guidance that Title IX's prohibition on discrimination "on the basis of sex" includes discrimination on the basis of gender identity. *See* Compl. ¶¶ 106–17. While a court in the Eastern District of Tennessee recently preliminarily enjoined federal enforcement of one of these guidances in the State, it ruled only on the Plaintiffs' procedural claim that the DOE failed to adhere to the notice and comment requirements of the Administrative Procedure Act. *See Tennessee v. U.S. Dep't of Educ.*, No. 3:21-CV-308, 2022 WL 2791450, at *19-*22 (E.D. Tenn. July 15, 2022). D.H., however, is not seeking to enforce the agency guidance, but Title IX itself. Moreover, in line with APA requirements, the DOE has issued a Proposed Rule to codify the guidance. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390 (proposed July 12, 2022) (to be codified at 34 C.F.R. part 106) (comment period ending Sept. 12, 2022).

14

9772da006a6e (noting for year-to-date report ending May 2022 that the School Board has received over $8 million in federal funding); *see also* Williamson County Schools, *Title IX Prohibits Sexual Harassment and Sexual Violence in Public Schools,* (last visited Aug. 1, 2022), https://www.wcs.edu/domain/1395 (Title IX policy of the School Board).

Third, the School Facilities Law causes Plaintiff numerous irreparable harms, including stigmatization, ostracization, anxiety, and distress during the formative years of her school education. *See, e.g.*, *Grimm*, 972 F.3d at 617–18 (recognizing "emotional and dignitary harm" of being forced to use separate bathrooms as legally cognizable harm under Title IX); *B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347, 356 (S.D. W. Va. 2021) (finding with "little difficulty" that the challenged State law "both stigmatizes and isolates [the transgender middle school plaintiff]"). Under the Law, Plaintiff is categorically barred from using a multi-occupancy restroom or changing facility associated with her gender identity. Instead, she is forced to use restrooms that correspond to what the School Facilities Law deems her "immutable biological sex as determined by anatomy and genetics existing at the time of birth." Tenn. Code Ann. § 49-2-802(4). Thus, Plaintiff is forced to use one of four single-occupancy restroom facilities at the school—each of which present significant issues. *See* Compl. ¶¶ 59–63; A.H. Decl. ¶¶ 35–40.

Being the only known student in her school who cannot use facilities that corresponds with her gender identity threatens both psychological and physical harm. *See* Compl. ¶¶ 6, 8–9, 31, 39, 50–52, 58–73, 78–86; A.H. Decl. ¶¶ 13, 18, 22–24, 35–57, 60–65. As already detailed, Plaintiff has been bullied, harassed, isolated, and ostracized; suffered from depression, anxiety, and internalized transphobic nightmares; and limited her food and water intake threatening dehydration and other health problems. Plaintiff has also been repeatedly outed and misgendered by other classmates and teachers. Further, the "alternative" of using a single-occupancy restroom is just as

15

harmful, as it singles Plaintiff out as the only student not permitted to use a multi-occupancy facility, which is humiliating, ostracizing, and stigmatizing. *See Grimm*, 972 F.3d at 617–18 (holding that the "stigma of being forced to use a separate restroom" constitutes harm because it brands all transgender students with a "scarlet 'T'"); *Whitaker*, 858 F.3d at 1050 ("Providing a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates the Act."); *Highland*, 208 F. Supp. 3d at 870–71 (harm established where plaintiff felt "stigmatized and isolated when she [wa]s forced to use a separate restroom"); *see also Brown v. Bd. of Educ.*, 347 U.S. 483, 494 (1954) (separating children from their peers based on an innate characteristic "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone").

Accordingly, Plaintiff is likely to succeed on her Title IX claim.

**B.      Plaintiff is Likely to Succeed on Her Equal Protection Claim**

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Thus, "the Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Sullivan v. Benningfield*, 920 F.3d 401, 408 (6th Cir. 2019) (internal quotation marks and citations omitted).

When evaluating state laws targeting transgender individuals, courts apply heightened scrutiny, as transgender individuals constitute a quasi-suspect class. *See, e.g.*, *Grimm*, 972 F.3d at 607–13; *Whitaker*, 858 F.3d at 1050; *Highland*, 208 F. Supp. 3d at 872–74. To survive heightened scrutiny, Defendants must show that the School Facilities Law "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Highland*, 208 F. Supp. 3d at 871 (quoting *United States v. Virginia*, 518

16

U.S. 515, 533 (1996)) (internal citations and quotation marks omitted). "The governmental interests enumerated must be 'real, as [o]pposed to . . . merely speculative.'" *Highland*, 208 F. Supp. 3d at 871 (quoting *Bernal v. Fainter*, 467 U.S. 216, 227–28 (1984)). The justification must be "exceedingly persuasive," and "[t]he burden of justification . . . rests entirely on the State." *Virginia*, 518 U.S. at 533.

Here, the School Facilities Law lacks an important governmental objective to justify its discriminatory actions. The text of the School Facilities Law is entirely silent as to its legislative purpose. The text of the Law contains no legislative findings or declarations of purpose, and no evidence that might demonstrate why it was necessary to enact this law at this particular time.

The subtext, however, is clear. The School Facilities Law is driven by a desire to further marginalize an insular minority—transgender individuals—and aimed at protecting non-transgender persons who are "aggrieved" by having to share facilities with a transgender person and the alleged "psychological, emotional, and physical harm" doing so supposedly causes. Tenn. Code Ann. § 49-2-805(c). In reality, gender-affirming school policies "likely enhance safety and reduce physical and mental health disparities for *transgender* populations" rather than harm their non-transgender peers. Stephen T. Russell et al*., Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. Adolescent Health 503, 505 (2018), https://pubmed.ncbi.nlm.nih.gov/29609917 (emphasis added). Indeed, the School Facilities Law's legislative history demonstrates that it was enacted principally to "remove[] the burden and stress from [non-transgender] teachers, administrators, parents and students," not protect or accommodate transgender students. *Tennessee Accommodations for All Children Act*, H.B. 1233 Before the House Floor Sess. - 25th Legislative Day (statement of Rep. Jason Zacary, Apr. 19, 2021),

17

https://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24699. Representative Gloria Johnson also noted that "this bill offers separate but unequal accommodations for transgender students . . . we're talking about the safety of students but we're not talking about the safety of *all* students." *Id.* (statement of Rep. Gloria Johnson, Apr. 19, 2021) (emphasis added).

This illegitimate interest is highlighted by the findings of another court in this District when it addressed a different bill targeting transgender people. In striking down a state requirement that businesses with gender neutral restroom policies post anti-inclusive notices on their facilities, the court noted that the "[c]ircumstances of [e]nactment" actually revealed the law to be an anti-transgender, anti-inclusive state-imposed speech mandate "endors[ing] an inaccurate version of [inclusive] policies that does not appear to exist much of anywhere outside of the imaginations of people who oppose the recognition of transgender identities altogether." *Bongo Prods.*, 2022 WL 1557664 at *4, *15. Earlier in the matter, when granting a preliminary injunction, that court explicitly stated that "the legislative history of the Act shows that it was devised, quite consciously and explicitly, as a direct response to social and political trends involving transgender people," *Bongo Prods.*, 548 F. Supp. 3d at 683, and that it was "wise [of the defendants] not to put too many of their eggs in the 'surviving strict scrutiny' basket, because there is simply no basis whatsoever for concluding that the Act is narrowly tailored to serve any compelling governmental purpose." *Id.* at 681. The School Facilities Law is the same.

Notwithstanding the lack of an explicit important governmental objective, defendants of non-inclusive restroom policies usually point to two alleged concerns: privacy and safety. Both are inapposite and have been roundly rejected by courts reviewing these questions.

**1. The School Facilities Law is not Substantially Related to Protecting Student Privacy**

To the extent Defendants might suggest that the Law serves the important interest of protecting non-transgender students' right of "privacy" not to share multi-occupancy restrooms or

changing facilities with transgender students, the argument fails. Such claims have been roundly rejected on innumerable grounds, including that no defendant has ever been able to present evidence that transgender students are more likely to violate their peers' privacy than non-transgender students. *See, e.g.*,

- *Highland*, 208 F. Supp. 3d at 874–76 (rejecting argument and finding that "[t]here is no evidence that Jane herself, if allowed to use the girls' restroom, would infringe upon the privacy rights of any other students");

- *Grimm*, 972 F.3d at 613–15 (rejecting privacy argument and finding "that bodily privacy of [non-transgender] boys using the boys restrooms did not increase when Grimm was banned from those restrooms");

- *Parents for Priv.*, 949 F.3d at 1217, 1221–27 (rejecting privacy argument and finding that there is "no . . . fundamental privacy right to avoid all risk of intimate exposure to or by a transgender person who was assigned the opposite biological sex at birth");

- *Boyertown Area Sch. Dist.*, 897 F.3d at 521 (rejecting privacy argument and holding that "the presence of transgender students in the locker and restrooms is no more offensive to constitutional or Pennsylvania-law privacy interests than the presence of the other students who are not transgender");

- *Whitaker*, 858 F.3d at 1052 (rejecting privacy argument, stating that school policy did "nothing to protect the privacy rights of each individual student vis-à-vis students who share similar anatomy" and that "[a] transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak glances at his or her classmates performing their bodily functions");

- *B.E.*, 2022 WL 2291763 at *7 (rejecting privacy argument as "Plaintiffs used the boys' restroom at the beginning of the school year without incident;" use of stalls generally prohibits students viewing each other while disrobed; and "to the extent Defendants . . . are concerned about distinguishing between transgender students and those students with merely a desire to gain access to the other locker room . . . the School can require documentation to verify the legitimacy of a student's request");

- *A.C.*, 2022 WL 1289352 at *7 (rejecting privacy argument as "[n]o evidence was provided to support the School District's concerns, and other courts dealing with similar defenses have also dismissed them as unfounded");

- *J.A.W.*, 323 F. Supp. 3d at 1041 (rejecting privacy argument); and

- *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 289–93 (W.D. Pa. 2017) (rejecting privacy argument and noting that anti-inclusive policy "would appear to do little to address any actual privacy concern of any student that is not already well addressed by the physical layout of the bathrooms").

19

Similarly, in this case there is no evidence Plaintiff is likely to do anything but use the restroom when she uses the restroom. Thus, restricting transgender students like Plaintiff from using the restroom is not substantially related to any purported privacy interests.

**2. The School Facilities Law is not Substantially Related to Protecting Student Safety**

To the extent Defendants might justify the School Facilities Law by arguing that it protects non-transgender students' safety, the argument also fails. Instead, such arguments are based on the harmful and prejudicial notion that transgender individuals are—in reality—incognito predators. Courts regularly reject this argument. *See, e.g.*, *Grimm*, 972 F.3d at 626 (Wynn, J., concurring) (describing and debunking "transgender predator" myth); *Parents for Priv.*, 949 F.3d at 1228–29 ("allegedly feel[ing] harassed by the mere presence of transgender students in locker and bathroom facilities" does not constitute the type of "severe, pervasive, and objectively offensive" harassment necessary to state Title IX hostile environment claim); *Cruzan v. Special Sch. Dist. # 1*, 294 F.3d 981, 984 (8th Cir. 2002) (per curiam) (holding that a transgender woman "merely being present" in the women's restroom did not amount to an adverse employment action of sexual harassment). Thus, any justification Defendants might offer that the Law protects student "safety" fails. *See J.A.W.*, 323 F. Supp. 3d at 1039; *Highland*, 208 F. Supp. 3d at 876–77.

In fact, transgender students who are forced to use the restroom which does not correspond to their gender identity are more at risk than their non-transgender peers. *See* Gabriel Murchison et al., *School Restroom and Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, 143 J. Am. Academy Pediatrics 1 (2019) (concluding that "[y]outh whose restroom and locker room use was restricted were more likely to experience sexual assault compared with those without restrictions"); Brief for Anti-Sexual Assault, Domestic Violence, and Gender-Based Violence Orgs. as Amicus Curiae in Support of Plaintiff-Appellee & Affirmance, *Adams v. The School Bd. of St. Johns Cnty., Fla.*, 3 F.4th 1299 (11th Cir. 2021) (No. 18-13592);

20

*Whitaker*, 858 F.3d at 1051 ("There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity.").

Here, there is no possible contention that D.H. presents a safety risk. She is a smart and intuitive girl, with similar hobbies, likes, and dislikes as any other peer eight-year-old girl. *See, e.g.*, Compl. ¶ 18. Where she differs, however, is that she has been bullied and harassed based on her gender identity. *See, e.g.*, A.H. Decl. ¶¶ 43–46. As such, the Law should show more concern for her safety, than the safety of her non-transgender peers from her.

In short, the School Facilities Law does not serve any purported objective grounded in safety, and the means used are not substantially related to any interest the Defendants might proffer.[8]

## II. PLAINTIFF WILL SUFFER SIGNIFICANT IRREPARABLE HARM WITHOUT INJUNCTIVE RELIEF

"Irreparable harm is presumed as a matter of law when a moving party shows 'that a constitutional right is being threatened or impaired'. . . . And there is likewise a presumption of an irreparable injury when a plaintiff has shown a 'violation of a civil rights statute.'" *Highland*, 208 F. Supp. 3d at 877–78 (internal citations omitted). Thus, Plaintiff "can show irreparable injury simply because both [her] Title IX claim and constitutional claim are likely to succeed on the merits." *Id.* at 878.

Presumption aside, Plaintiff will suffer irreparable harm as a result of the School Facilities Law for several reasons. First, being precluded from using the restroom that comports with her gender identity results in feelings of marginalization, isolation, distress, anxiety, and discomfort,

---

[8]     Even under Rational Basis review, the School Facilities Law still fails constitutional scrutiny. *See Highland*, 208 F. Supp. 3d at 877 (holding, after determining that school policy failed heightened scrutiny, that "[e]ven if the Court were to apply rational basis review to [plaintiff]'s equal-protection claim, she would likely succeed on the merits").

because it separates Plaintiff from the rest of the entire student body, thus branding her as being "different" and requiring her to continuously "out" herself as transgender. *See, e.g.*, Compl. ¶ 65; A.H. Decl. ¶ 43; *see also Whitaker*, 858 F.3d at 1044–46 (irreparable harm established where exclusionary restroom policy, which identified student as transgender and therefore "different," caused plaintiff "significant psychological distress and place[d] [him] at risk for experiencing life-long diminished well-being and life-functioning" due to restricted water intake); *Highland*, 208 F. Supp. 3d at 878 ("The stigma and isolation Jane feels when she is singled out and forced to use a separate bathroom . . . is a clear case of irreparable harm to an eleven-year-old girl."); *Evancho*, 237 F. Supp. 3d at 294 (similar holding); *J.A.W.*, 323 F. Supp. 3d at 1039 (similar holding).

Moreover, any "alternative" of using a single-occupancy restroom, such as an unhygienic restroom in the nurse's office, is just as stigmatizing and has led Plaintiff in the past to avoid using the restroom at all, at the expense of her health and ability to focus on her education. *See* Compl. ¶¶ 60, 68; A.H. Decl. ¶¶ 37, 50–51. Indeed, due to the lack of gender-affirming restroom options last year when D.H. was in second grade, D.H. limited her food and water intake to minimize the need to use the restroom during school hours. Courts have thus recognized that such "alternatives" to inclusive policies are not reasonable and further establish irreparable harm. *See Whitaker*, 858 F.3d at 1045 (irreparable harm established where student "was faced with the unenviable choice between using a bathroom that would further stigmatize him and cause him to miss class time, or avoid use of the bathroom altogether at the expense of his health"); *J.A.W.*, 323 F. Supp. 3d at 1039 (similar holding).

Enforcing the Law would further disrupt the significant improvement in D.H.'s health and well-being since she began her social transition and further exacerbate her adjustment disorder. Her parents fear that continued enforcement of the School Facilities Law will cause Plaintiff to

develop gender dysphoria, not because her brain tells her that her body is wrong, but because the School Facility Law tells her that she does not meet the expectation of what it means to be a girl. Compl. ¶ 82; A.H. Decl. ¶ 63; *see also Dodds*, 845 F.3d at 221–22 (holding that staying preliminary injunction "would disrupt the significant improvement in Doe's health and well-being that has resulted from the injunction, further confuse a young girl with special needs who would no longer be allowed to use the girls' restroom, and subject her to further irreparable harm").

Further, being forced to use a single-occupancy restroom during second grade led to the disclosure of Plaintiff's transgender status to others and significant bullying and harassment by her peers. *See* Compl. ¶¶ 60, 63–66; *see also J.A.W.*, 323 F. Supp. 3d at 1039.[9] She has, for example, been forced to reveal her transgender status to janitors who have questioned why she is using a restroom not usually available to students. *See* Compl. ¶ 60; A.H. Decl. ¶ 37. She has also been subject to repeated questioning by peers and endured their policing of her restroom use because the Elementary School inhibits her ability to live her life as the girl she is. *See* Compl. ¶¶ 66, 71.

Plaintiff will suffer irreparable harm absent preliminary relief, as the damaging effects of the Law during her formative years will be long-lasting and cannot be adequately compensated.

## III.     THE BALANCE OF HARDSHIPS WEIGHS IN PLAINTIFF'S FAVOR

The balance of equities favors granting the requested injunction. "The degree of likelihood of success that need be shown to support a preliminary injunction varies inversely with the degree of injury the plaintiff might suffer." *Legatus v. Sebelius*, 988 F. Supp. 2d 794, 815 (E.D. Mich.

---

[9]     *See also* Brian S. Barnett et al., *The Transgender Bathroom Debate at the Intersection of Politics, Law, Ethics, and Science*, 46 J. Am. Acad. Psychiatry & L. 232, 235 (Nov. 2, 2018), http://jaapl.org/content/jaapl/46/2/232.full.pdf ("[T]ransgender individuals are often victims of sexual assault."); Daniel Trotta, *U.S. Transgender People Harassed in Public Restrooms: Landmark Survey*, Reuters (Dec. 8, 2016), https://www.reuters.com/article/us-usa-lgbt-survey/u-s-transgender-people-harassed-in-public-restrooms-landmark-survey-idUSKBN13X0BK ("Almost 60 percent of transgender Americans have avoided using public restrooms for fear of confrontation.").

23

2013). As stated above, it is highly likely that Plaintiff will ultimately prevail in this matter. Plaintiff has demonstrated that, absent the granting of an injunction, she will continue to suffer irreparable harm. In turn, Defendants cannot point to any possible harms should the injunction be granted. This factor clearly weighs in Plaintiff's favor.

In addition, the experience of school districts across the country with inclusive policies and practices demonstrates that allowing transgender students to use the sex-designated facilities consistent with their gender identity will not cause any disruption, but rather will result in positive outcomes. *See Whitaker*, 858 F.3d at 1054–55 (school district did not demonstrate that it would suffer harm from complying with injunction, particularly in light of evidence from school administrators throughout the country which demonstrated that "all students' needs are best served when students are treated equally"). None of the Defendants here will suffer any hardship from an injunction enjoining the enforcement of this patently discriminatory law, or permitting Plaintiff to use the school facilities corresponding to her gender identity. Indeed, "enforcing the United States Constitution against a state government is a vindication, not a derogation, of the enduring importance of state autonomy." *Bongo Prods.*, 548 F. Supp. 3d at 687 (finding a "low likelihood that the injunctive relief would intrude on any powers legitimately retained by the State" and "a high likelihood of success with regard to the plaintiffs' constitutional challenges.")

## IV.    THE PUBLIC INTEREST STRONGLY FAVORS GRANTING A PRELIMINARY INJUNCTION

As the Sixth Circuit has explained, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009). The preferences of some cannot justify unconstitutional discrimination against others. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985). Furthermore, "'the overriding public interest lays in the firm enforcement of Title IX.'" *Highland*, 208 F. Supp. 3d at 878 (quoting

24

*Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir. 1993)). Accordingly, courts have consistently held that it is in the public interest to enjoin enforcement of a discriminatory law that prevents transgender students from using the restroom and related school facilities that correspond to their gender identity. *See Dodds*, 845 F.3d 222 (holding that the injunction of a such a law was in the public interest and denying motion to stay); *see also Whitaker*, 858 F.3d at 1054–55; *J.A.W.*, 323 F. Supp. 3d at 1041–42; *Evancho*, 237 F. Supp. 3d at 294–95.

Accordingly, the public interest strongly favors granting the preliminary injunction.[10]

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court issue a preliminary injunction enjoining the Defendants from enforcing the School Facilities Law and permitting Plaintiff to use the multi-occupancy girls' restrooms at the Elementary School.

Dated:     August 2, 2022

                                        Respectfully submitted,


                                        By:   */s/Tricia Herzfeld*
                                        Tricia Herzfeld (BPR #26014)
                                        BRANSTETTER STRANCH & JENNINGS PLLC
                                        223 Rosa L. Parks Avenue, Suite 200
                                        Nashville, TN 37203
                                        T: (615) 254-8801
                                        F: (615) 255-5419
                                        triciah@bsjfirm.com

                                        Adam S. Lurie*
                                        Sean Mooney*
                                        Benjamin Kurland*
                                        LINKLATERS LLP

---

[10]     The Court should exercise its discretion and not require Plaintiff to post any bond in connection with the injunction. *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (district court properly exercised its discretion in waiving bond requirement under Fed. R. Civ. P. 65(c) given the "the strength of [the moving party's] case and the strong public interest involved"); *FemHealth, USA, Inc. v. City of Mount Juliet*, 458 F. Supp. 3d 777, 805 n.27 (M.D. Tenn. 2020) (similarly declining to require a bond in light of the "the strength of the movant's case and . . . strong public interest . . . present").

25

1290 Avenue of the Americas
New York, NY 10104
T: (212) 903-9000
F: (212) 903-9100
adam.lurie@linklaters.com
sean.mooney@linklaters.com
benjamin.kurland@linklaters.com

Jason Starr*
Ami Patel*
HUMAN RIGHTS CAMPAIGN FOUNDATION
1640 Rhode Island Avenue NW
Washington, D.C. 20036
T: (202) 628-4160
F: (202) 628-0517
jason.starr@hrc.org
ami.patel@hrc.org

* Motions for admission *pro hac vice* forthcoming

*Attorneys for Plaintiff D.H., a minor, by her next
friends A.H., mother, and E.H., father*

26

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of August 2022, I notified the below service list of this

Motion and will be serving the same via electronic mail contemporaneously with this filing.

Alexander S. Rieger
Senior Assistant Attorney General
Public Interest Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Alex.rieger@ag.tn.gov

Dana Ausbrooks
Williamson County Commission
2072 Roderick Circle
Franklin, TN 37064
Dana.ausbrooks@wsc.edu

*/s/ Tricia Herzfeld*
Tricia Herzfeld

27