**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **D.H. a minor by her next friends A.H.,** | ) | |
| **Mother, and E.H., father,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00570** |
| | ) | **Judge Campbell** |
| **WILLIAMSON COUNTY BOARD OF** | ) | **Magistrate Judge Frensley** |
| **EDUCATION; JASON GOLDEN, in his** | ) | |
| **official capacity as Director of Williamson** | ) | |
| **County Schools; THE TENNESSEE** | ) | |
| **DEPARTMENT OF EDUCATION;** | ) | |
| **and PENNY SCHWINN, in her official** | ) | |
| **capacity as Commissioner of the** | ) | |
| **Tennessee Department of Education,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**WILLIAMSON COUNTY BOARD OF EDUCATION AND JASON GOLDEN'S**
**RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

Come Defendants, Williamson County Board of Education ("WCBOE") and Jason Golden (hereinafter referred to collectively as the "County Defendants") and submit this Response to Plaintiff's Motion for Preliminary Injunction filed August 2, 2022. (Docs. 5, 6.)

### RELEVANT FACTS AND PROCEDURAL HISTORY

Plaintiff, a third grader attending school in Williamson County brought this action by and through her parents as next friends, challenging the Tennessee Accommodations for All Children Act, Tenn. Code Ann. § 49-2-801, *et seq.* (referred to in Plaintiff's Motion for Preliminary Injunction as the "School Facilities Law" and referred to herein as "the Act") and WCBOE's compliance with the Act. The Act, which was adopted by the General Assembly in April 2021

and signed by Governor Bill Lee the following month, took effect on July 1, 2021. (Doc. 1 at ¶ 92.) The Act provides that public schools "shall . . . provide a reasonable accommodation" to any public-school student, teacher, or employee who:

> Desires greater privacy when using a multi-occupancy restroom or changing facility designated for the student's, teacher's, or employee's sex and located within a public school building, or when using multi-occupancy sleeping quarters designated for the student's, teacher's, or employee's sex while the student, teacher, or employee is attending a public school-sponsored activity[.]

Tenn. Code Ann. § 49-2-803. The Act defines "sex" to mean "a person's immutable biological sex as determined by anatomy and genetics existing at the time of birth." Tenn. Code Ann. § 49-2-802(4). For purposes of the Act, a "'[r]easonable accommodation' includes, but is not limited to, access to a single-occupancy restroom or changing facility or use of an employee restroom or changing facility." Tenn. Code Ann. § 49-2-802. However, the Act disallows certain accommodations, including those accommodations which would allow an individual to "[a]ccess to a restroom or changing facility that is designated for use by members of the opposite sex while members of the opposite sex are present or could be present[.]" Tenn. Code Ann. § 49-2-802(2)(a). Any Tennessee public school or local education agency ("LEA") that "intentionally allow[s] a member of the opposite sex to enter [a] multi-occupancy restroom or changing facility while other [students, teachers, or employees are] present" is subject to a private right of action for monetary damages, costs and attorney fees. Tenn. Code Ann. § 49-2-805. As acknowledged by Plaintiff, LEAs have no choice but to comply with the Act's terms, as failing to do so "opens them up to lawsuits by innumerable individuals." (Doc. 1 at ¶ 102).[1]

---

[1] The legislative history is particularly illustrative of the fact that the Act is anything but permissive. For example, during a House Floor Session on April 19, 2021, Representative Jason Zachary, a sponsor of the Act, announced the purpose of the Act, noting that the Act "removes the burden and stress of accommodation from our teachers, administrators, parents, and students. Once this legislation passes, Tennessee will have a very clear path forward for every school across our

Plaintiff D.H. is a third grader at an Elementary School in Williamson County (Doc. 1 at ¶2) (the school is referred to herein only as "Elementary School", and its principal and former principal referred to only by their initials, in an effort to protect Plaintiff's privacy). D.H. attended the Elementary School in first grade until the schools were closed due to COVID. In the Fall of 2021, D.H. attended an online school because she was not yet vaccinated, and the Elementary School did not have a mask policy in place at the start of the school year. (Doc. 1 at ¶7). After spending a semester enrolled in the online school, Plaintiff asked to be allowed to return to the Elementary School for the second semester of second grade and was thereafter re-enrolled to attend in-person schooling at the Elementary School beginning in January 2022. (Doc. 1 at ¶¶ 7–8, 57; Doc. 7 at ¶ 30–31.)

Prior to the start of the Spring 2022 semester, Plaintiff's parents met with the Elementary School Principal, J.J., and Plaintiff's psychologist to address the ways in which the Elementary School could be supportive of Plaintiff, including how to best address Plaintiff's access to restroom facilities in light of the Act. (Doc. 1 at ¶ 55; Doc. 7 at ¶¶ 28–29; Affidavit of J.J. (hereinafter "J.J. Aff.") at ¶ 3.) Plaintiff's parents requested that Plaintiff be allowed to use the multi-occupancy

_____

State." House Floor Session – 25th Legislative Day, 112th Tennessee General Assembly, 36:21–36:45 (Apr. 19, 2021), https://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24699&meta_id=595529. When asked whether the Act was mandatory or permissive, Representative Zachary twice stated that the Act "will be law once it passes." *Id.* at 38:33–38:48. When asked what the penalties would be if a local education agency did not follow the law, Representative Zachary stated: "If an LEA chooses not to follow the law if passed, it provides for a cause of action for those who . . . have experienced the school breaking the law allowing children to violate the Accommodations Act." *Id.* at 38:49–39:21. When asked about the cost of the Act to local boards of education, Representative Zachary stated that the cost "would be determined by any suit that would be brought if they violate state law." *Id.* at 41:24–41:37. Representative Zachary further stated that, while he did not anticipate lawsuits, "any time you violate a state law, there is always some sort of consequence. And if any LEA chooses to violate state law, then this provides a clear path for a cause of action if you violate state law." *Id.* at 41:39–42:02.

girls' restrooms. (Doc. 7 at ¶ 28; J.J. Aff. at ¶ 4.) J.J. explained to Plaintiff's parents that this accommodation could not be granted due to state law. (Doc. 7 at ¶ 32, J.J. Aff. at ¶ 4.) However, J.J. told Plaintiff's parents that Plaintiff could use any of four single-occupancy restrooms in the building if she was uncomfortable using the multi-occupancy boys' restrooms. (Doc. 7 at ¶¶ 33, 35; J.J. Aff. at ¶ 4.)

J.J. walked Plaintiff through the Elementary School and showed her where each of the four single-occupancy restrooms were located. (J.J. Aff. at ¶ 5.) To provide Plaintiff with access to these restrooms without singling her out, the Elementary School implemented a process in which a small group of male and female students, including Plaintiff, would be sent to a single-occupancy restroom during group bathroom breaks so that Plaintiff would not be the only student using a single-occupancy restroom. (J.J. Aff. at ¶ 5–6.) At one point during the semester, Plaintiff's teacher noticed that Plaintiff was using the restroom less frequently during the school day and reported her observation to Plaintiff's parents. (J.J. Aff. ¶ 7.) J.J. offered to reach out to Plaintiff and review the available options with her to help increase her comfort level with the available facilities; however, Plaintiff's parents rejected this offer. (J.J. Aff. at ¶ 7.)

Plaintiff received support in other areas from Elementary School staff during her second-grade year. Upon the request of Plaintiff's parents, all adults in the Elementary School were instructed to refer to Plaintiff by her preferred pronouns (she/her/hers). (J.J. Aff. at ¶ 9.) When Plaintiff's mother complained that other students were making comments regarding gender norms that made Plaintiff uncomfortable, the Elementary School's counselor, whom Plaintiff identified as being a "safe" person for her, began regularly checking in with Plaintiff. (J.J. Aff. at ¶ 8.) A teacher's assistant with whom Plaintiff felt comfortable also checked in with Plaintiff. (J.J. Aff. at ¶ 8.) Additionally, at the request of Plaintiff's mother, J.J. and Plaintiff's second-grade teacher

4

attended a PFLAG meeting concerning school issues. (J.J. Aff. at ¶10.) At the conclusion of the school year, Plaintiff's mother sent J.J. a note thanking her for the Elementary School's support of Plaintiff and indicating that things had improved significantly for D.H. (J.J. Aff. at ¶ 11, Exhibit to J.H. Aff.)

After Plaintiff completed the second semester of her second-grade year at the elementary school, her parents requested and received an out-of-zone waiver so that Plaintiff could attend a Williamson County school that had been constructed in a manner so as not to have multi-occupancy restrooms. (Doc. 7 at ¶ 66–67; Affidavit of K.M. (hereinafter "K.M. Aff.") at ¶ 3.) However, Plaintiff indicated to her parents that it was her strong preference to return to the Elementary School for her third-grade year, and her parents agreed. (Doc. 7 at ¶ 68, 69.)

Both before and after deciding to re-enroll Plaintiff at the Elementary School in the summer of 2022, Plaintiff and her parents were in communication with K.M., the Elementary School's new principal. (K.M. Aff. at ¶ 3.) K.M. requested that Plaintiff's parents suggest some books that would help educate K.M. and Elementary School staff on how to best interact with Plaintiff. (K.M. Aff. at ¶ 4.) K.M. and Plaintiff's third-grade academic teachers are currently reading those books recommended by Plaintiff's parents in an effort to better support Plaintiff. (K.M. Aff. at ¶ 4.) K.M. has met with the entire third grade team, the entire related arts team, and the Elementary School's counseling staff to discuss proactive strategies to address Plaintiff's needs. (K.M. Aff. at ¶ 5.) Plaintiff's teachers and counselors have met with Plaintiff's parents to better understand behaviors that may indicate that Plaintiff is experiencing distress so that they can appropriately respond. (K.M. Aff. at ¶ 11.)

On August 1, 2022, Plaintiff's parents, Plaintiff's two academic teachers, the Elementary School's counselor, and K.M. met to discuss a host of subjects related to how best support Plaintiff.

(K.M. Aff. at ¶ 5.) This meeting lasted over three hours. (K.M. Aff. at ¶ 5.) As a result of the August 1 meeting as well as those discussions had throughout the summer, new measures were put in place to support and accommodate Plaintiff at the Elementary School. Specifically, Plaintiff's teachers, one of whom has experience working with and supporting transgender students, and Plaintiff's counselor will check in with Plaintiff regularly to ensure she is adapting well to the new school year. (K.M. Aff. at ¶ 6.) Plaintiff will check in with her counselor every day during RTI time.[2] (K.M. Aff. at ¶ 6.) K.M. has assured Plaintiff that the principal's office is always a safe space for her and, after spending time with Plaintiff, K.M. believes that Plaintiff would feel comfortable coming to K.M. with any issues that may arise. (K.M. Aff. at ¶ 10.)

Regarding Plaintiff's restroom use, Plaintiff will have a key in her desk so that she can access the single-occupancy restroom in the occupational therapy room. (K.M. Aff. at ¶ 7.) She has also been given an ID indicating that she has express permission to be in this restroom. (K.M. Aff. at ¶ 7.) This accommodation allows Plaintiff to simply request to leave the classroom (as any other student would) to go to the restroom, and then to enter the occupational therapy room and the restroom within it without having to answer questions or justify her presence. (K.M. Aff. at ¶ 7.) Plaintiff also has access to the single-occupancy restroom in the special education classroom. (K.M. Aff. at ¶ 8.) Additional measures have been taken to make this restroom a more viable option for Plaintiff. (K.M. Aff. at ¶ 8.) Specifically, all staff have been educated about the critical need for this restroom to remain clean, custodians have been directed to clean the restroom twice daily, and a counselor has been tasked with spot checking the restroom for cleanliness during the day. (K.M. Aff. at ¶ 8.) Finally, teachers have been instructed that, should Plaintiff need to use the

---

[2]    RTI time is a time period where all students are normally rotating through various RTI providers. (K.M. Aff. at ¶ 6.)

facilities during a group restroom break such as on the way to/from lunch, Plaintiff is to be given an "errand" to run that will take her in the direction of an available restroom, so that she can go to a single-occupancy restroom without arousing the curiosity of her peers. (K.M. Aff. at ¶ 9.) When Plaintiff goes to the restroom separately from other students, she will travel through an internal circular corridor where her classmates will not be able to see where she is going. (K.M. Aff. at ¶ 9.) She will also be permitted to carry a folder, note from the principal, and/or a workbook which allows her to check in with a trusted counselor or teacher if needed. (K.M. Aff. at ¶ 9.)

The staff at the Elementary School has engaged in an interactive process with Plaintiff and her parents in an effort to support and accommodate Plaintiff while complying with state law. (K.M. Aff. at ¶ 12.) Despite the extensive scope of these supportive measures, Plaintiff filed suit on August 1, 2022, challenging the legality of the Act and seeking declaratory and injunctive relief requiring the County Defendants to allow Plaintiff to use the multi-occupancy girls' restrooms at the Elementary School—an accommodation that the Act does not permit. (Doc. 1.) The instant Motion for Preliminary Injunction was filed the following day. (Doc. 5.)

## ARGUMENT

Plaintiff's Motion for Preliminary Injunction against the County Defendants should be denied. Plaintiff seeks a preliminary injunction prohibiting Defendants from enforcing the Act and requiring the Defendants to permit Plaintiff to use the multi-occupancy girls' restroom at the Elementary School, an accommodation that is unavailable under the terms of the Act. The bulk of Plaintiff's Motion for Preliminary Injunction challenges the legality of the Act itself. Because the responsibility for defending the constitutionality of state laws is properly left to the Tennessee Attorney General, the County Defendants leave the defense of the Act to the State Defendants. *See* Tenn. Code Ann. § 8-6-109(b)(9); *see also Kelly v. Lee*, No. 1:18-CV-00170-DCLC, 2020 U.S.

Dist. LEXIS 78369, at *8 (E.D. Tenn. May 4, 2020) ("Where parties challenge the constitutionality of any Tennessee statute, Tennessee law requires the Attorney General 'to be a party defendant in any [such] proceeding where the constitutionality of the Act of the legislature is before the Court on declaratory judgments proceeding.'" (citations omitted)). With respect to the County Defendants, Plaintiff's request for preliminary injunction appears to be based solely upon the County Defendants' denial, in compliance with the Act, of Plaintiff's request to use multi-occupancy girls' restrooms. For the reasons outlined herein, Plaintiff's request for preliminary injunction against the County Defendants should be denied.

## I. PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF IS BARRED BY LACHES.

Last year, this Court held that a request for temporary injunctive relief seeking to enjoin enforcement of the Act was barred by laches. On August 2, 2021, three days before the school year was set to begin, the parents of two transgender children filed suit in this Court seeking to enjoin the local school board, its superintendent, the Governor, and the Attorney General from enforcing the Act. *See A.S. v. Lee*, No. 3:21-cv-00600, 2021 U.S. Dist. LEXIS 146899, at *2–3 (M.D. Tenn. Aug. 5, 2021). The plaintiffs filed a motion for a temporary restraining order permitting the minor plaintiffs "to use (i) multi-occupancy restrooms and changing facilities located within a public school building that correspond with their gender identity, rather than their gender assigned a birth; and (ii) multi-occupancy sleeping quarters while attending a public school-sponsored activity that correspond with their gender identity, rather than their gender assigned at birth." *Id.* at *3. The *A.S.* Court denied the motion, holding that the plaintiff's request for temporary restraining order was barred by the doctrine of laches. *Id.* at *27.

Preliminary relief should likewise be denied in this case, based on the delay in bringing this action. On August 2, 2022, three days before the start of school, Plaintiff moved for a

preliminary injunction seeking to enjoin the County Defendants from enforcing the Act. (Docs. 1, 5.) Like the plaintiffs in *A.S.*, Plaintiff asks this Court to order that she be permitted "to use the multi-occupancy restrooms located within any public school building that correspond with her gender identity, rather than the gender assigned at her birth." (Doc. No. 5.) As in *A.S.*, this action was filed only a few days before the start of the school year on August 5, 2022. (Doc. No. 1 at ¶ 25.) In *A.S.*, this Court held that the plaintiffs' sought-after injunctive relief was barred by laches, and there are no materially different facts in the instant action that warrant a different result in this case. *See A.S.*, 2021 U.S. Dist. LEXIS 146899, at *27–28. Accordingly, Plaintiff's Motion for a Preliminary Injunction should be denied.

In the Sixth Circuit, "laches is 'a negligent and unintentional failure to protect one's rights.'" *United States v. City of Loveland*, 621 F.3d 465, 473 (6th Cir. 2010) (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)); *see also A.S.*, 2021 U.S. Dist. LEXIS 146899, at *6. "A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 320 (6th Cir. 2001); *see also A.S.*, 2021 U.S. Dist. LEXIS 146899, at *7. Both elements are present in this case.

### A. Plaintiff[3] unreasonably delayed in seeking a preliminary injunction.

The Act was signed into law on May 14, 2021 and took effect on July 1, 2021. (Doc. 1 at ¶ 92.) Although Plaintiff attended the Elementary School for the 2020-2021 school year as a first grader, she transferred to an online school for the first half of her second-grade year (Fall of 2021).[4]

---

[3]   References to "Plaintiff" in relation to the prosecution of this lawsuit (as opposed to references to her as a student at the Elementary School) are intended to refer to Plaintiff, by and through her parents as next friends.

[4]   The decision to send Plaintiff to an online school was related to COVID concerns, *not* Plaintiff's gender identity. (Doc. 1 at ¶ 7.)

(Doc. 1 at ¶¶ 3, 7.) When Plaintiff re-enrolled in the Elementary School in January of 2022, the Act was already in effect. (Doc. 1 at ¶¶ 7–8, 54, 57). In accordance with the Act, the Elementary School did not allow Plaintiff to use the multi-occupancy restrooms corresponding to her gender identity, but instead provided her with an accommodation allowing her to use one of four single-occupancy restroom facilities at the Elementary School.[5] (Doc. 1 at ¶¶ 8–9, 58.) It is this accommodation that Plaintiff now challenges. (Doc. 1 at ¶¶ 10–12.) Despite knowing of the impact of the Act on her ability to use the restroom of her choice at least as early as January 2022, Plaintiff's parents waited nearly eight months to file a Motion for a Preliminary Injunction on August 2, 2022. (Docs. 1, 5.) Even if Plaintiff's parents did not believe the accommodations amounted to unconstitutional conduct until after she lived with them for some period of time during the Spring 2022 semester, they still failed to act with diligence when they "knew everything [they] needed to file the present lawsuit" for months but failed to act. *See Corizon, LLC v. Wainwright*, No. 3:20-CV-00892, 2020 U.S. Dist. LEXIS 200752, at *29 (M.D. Tenn. Oct. 28, 2020). This is an inexcusable delay. *See id. Advocacy Org. for Patients & Providers v. Mercy Health Servs.*, 987 F. Supp. 967, 970 (E.D. Mich. 1997); *A.S.*, 2021 U.S. Dist. LEXIS 146899, at *9–20.[6]

---

[5]    In addition to the provision of access to single-occupancy restrooms, the Elementary School has provided numerous other accommodations to Plaintiff to make her feel supported at school. (K.M. Aff. at ¶¶ 3–12; J.J. Aff. at ¶¶ 3–11.)

[6]    In *A.S.*, the Court found that the plaintiffs had not exercised diligence where the record reflected that they had known about the Act for months prior to its enactment, were actively opposed to the Act from its inception, and had failed to demonstrate that the decision to enroll the plaintiffs in public school was made only a week and a half prior to filing suit. 2021 U.S. Dist. LEXIS 146899, at *9–17. The Court then went on to note that even if the plaintiffs had reached their decision that recently, it still would not excuse the plaintiffs filing their complaint at the eleventh hour, especially when they "had counsel (in substantial numbers), and that at least some of them [had] considerable expertise and experience in the relevant issues and thus would not likely have been starting from scratch in drafting the relevant documents." *Id.* at *17–19. In the instant case, this is even more true as several of the lawyers who represented *A.S.* now represent Plaintiff. *See id.* at *1; Doc. 1.

**B. The delay in moving for injunctive relief has prejudiced the County Defendants.**

"There are two kinds of prejudice which might support a defense of laches: (1) the delay has resulted in the loss of evidence which would support the defendant's position [(evidence-based prejudice)]; or (2) the defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed [(expectations-based prejudice)]." *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742, 754 (M.D. Tenn. 2020); *see also A.S.*, 2021 U.S. Dist. LEXIS 146899, at *20. "The greater the delay, the less the prejudice required to show laches." *Perry v. Judd*, 840 F. Supp. 2d 945, 954 (E.D. Va.), *aff'd*, 471 F. App'x 219 (4th Cir. 2012); *see also A.S.*, 2021 U.S. Dist. LEXIS 146899, at *21 (citations omitted).

Plaintiff's delay in filing this action has resulted in expectations-based prejudice to the County Defendants. "…[E]xpectations-based prejudice can be found based on the defendants' 'expenditure of resources in reliance upon the status quo ante.'" *A.S.*, 2021 U.S. Dist. LEXIS 146899, at *22 (quoting *Vineberg v. Bissonnette*, 548 F.3d 50, 57 (1st Cir. 2008)). As was the case in *A.S.*, here, actions have been taken and resources have been expended by the County Defendants to put accommodations in place that are consistent with the Act. *See id.* at *22–23. Specifically with respect to Plaintiff, Elementary School staff had several conversations with Plaintiff's parents, including a three-hour meeting on August 1, 2022 between Plaintiff's parents and the Elementary School's principal, Plaintiff's third grade teachers, and the Elementary School's counselor to discuss ways in which the Elementary School could best support and accommodate Plaintiff while complying with state law. (Doc. 1 at ¶ 56; Doc. 7 at ¶ 28; K.M. Aff. at ¶ 5.) As a result of these conversations, the Elementary School developed a battery of measures to support Plaintiff while also complying with state law, and staff have been informed of and trained on these measures. (K.M. Aff. at ¶¶ 3–12.) In waiting until only a few days before the school year started

to file suit, Plaintiff has disrupted the County Defendants' expectations and plans regarding how to accommodate her. This expectations-based prejudice is "sufficient to support application of laches in this case." *A.S.*, 2021 U.S. Dist. LEXIS 146899, at *25.

Because both elements of laches are present in the instant case, Plaintiff's Motion for a Preliminary Injunction should be denied.

## II. PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION REQUIRING THE COUNTY DEFENDANTS TO PERMIT HER TO USE MULTI-OCCUPANCY GIRLS' RESTROOMS.

Preliminary injunctions are considered extraordinary relief. *Memphis A. Phillip Randolph Inst. v. Hargett*, 482 F. Supp. 3d 673, 679 (M.D. Tenn. 2020) (citing *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18, Int'l Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972)). "A preliminary injunction should be granted only if the movant carries its burden of proving that the circumstances clearly demand it." *Id.* (citing *Overstreet v. Lexington—Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)). When determining whether to issue a preliminary injunction, a district court must balance four factors: (1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. *McPherson v. Michigan High Sch. Ath. Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (quoting *Sandison v. Michigan High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995)) (internal quotations omitted). Factors three and four merge when, as is the case here, the party opposing the preliminary injunction is a governmental entity. *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 1762 (2009). The irreparable injury requirement, however, is "indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief now as

opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). In the instant case, the balance of these factors weighs against granting a preliminary injunction, and Plaintiff's Motion for Preliminary Injunction should therefore be denied.

### A. Plaintiff does not have a strong likelihood of success on the merits of her claims against the County Defendants.

#### i. Plaintiff's claims against Superintendent Golden in his official capacity are subject to dismissal.

Plaintiff filed suit against Defendant Golden in his official capacity as Director of Williamson County Schools. (Doc. 1.) "Official capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Hall v. Metro. Gov't*, No. 3:17-cv-01268, 2018 U.S. Dist. LEXIS 2365, at *25 (M.D. Tenn. Jan. 5, 2018) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, n.55 (1978)). "Where the entity itself is named as a defendant, an official capacity claim is redundant. Consequently, district courts within the Sixth Circuit frequently dismiss as superfluous official capacity claims brought in suits where the municipal entity is also named as a defendant." *Id.* (collecting cases). In the instant action, Plaintiff has named both WCBOE and Golden as Defendants. (Doc. 1.) Golden is an agent of WCBOE. (Doc. 1 at ¶ 21.) Consequently, Plaintiff's official capacity claims against Golden are redundant and are therefore subject to dismissal. *See Hall*, 2018 U.S. Dist. LEXIS 2365, at *25.

#### ii. Plaintiff's claims against the County Defendants are subject to dismissal because Plaintiff has failed to exhaust her administrative remedies under Section 504 of the Rehabilitation Act.

Plaintiff seeks to compel the County Defendants to allow her to use the multi-occupancy girls' restrooms in contravention of the Act. Indeed, she claims that accommodations related to her request to use the multi-occupancy girls' restroom are addressed in her 504 Plan, which

13

addresses, among other things, her adjustment disorder.[7] References to Plaintiff's 504 plan are peppered throughout her filings (Doc. 1. at ¶¶ 2, 53, 65, n.3; Doc. 6 at 18; Doc. 7 at ¶¶ 26, 32, 42), and when read in context with Plaintiff's other allegations, it is clear that Plaintiff is seeking a modification of her 504 Plan. Plaintiff alleges that when she attended online school, her 504 plan allowed her to use multi-occupancy girls' restrooms (although such usage would only apply when on field trips or on site at school for some reason, since school was generally remote). (Doc. 7 at ¶ 26.) This accommodation, however, was removed from Plaintiff's 504 plan when she re-enrolled in the Elementary School in order to comply with state law. (Doc. 1 at ¶ 8; Doc. 7 at ¶¶ 31–32.) It was replaced with an accommodation allowing Plaintiff to use single-occupancy restrooms. (Doc. 1 at ¶ 9.) Plaintiff alleges that "[t]hese restroom 'accommodations'…are not accommodations at all." (Doc. 1 at ¶ 9.) Plaintiff also alleges that this insufficient accommodation has resulted in lost class time, (Doc. 1 at ¶ 62), harassment, (Doc. 1 at ¶¶ 69–72), and health issues, (Doc. 1 at ¶¶ 78–80, 83). The gravamen of these allegations is that Plaintiff is being denied a free appropriate public education by not being allowed to use the multi-occupancy girls' restrooms.

Because Plaintiff is seeking a modification of her 504 Plan to ensure that she is receiving a free appropriate public education, she must first exhaust her administrative remedies under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq. See Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 170 (2017), holding that Section 1415(l) requires that a

---

[7]   As noted by Plaintiff, "[a] 504 Plan is an educational plan developed according to Section 504 of the Rehabilitation Act to ensure that a child attending an elementary or secondary educational institution who has a qualifying disability receives accommodations necessary to ensure the child's academic success and access to the learning environment. *See* 29 U.S.C. § 794; 34 C.F.R. § 104.33(a) (establishing that federally-funded schools 'shall provide a free appropriate public education' to each qualifying disabled student); *see also* Univ. of Wash., *What Is the Difference Between an IEP and a 504 Plan?,* Disabilities, Opportunities, Internetworking, and Tech. Ctr. (May 24, 2022), https://www.washington.edu/doit/what-difference-between-iep-and-504-plan." (Doc. 1 at ¶ 2, n.3.)

14

plaintiff exhaust the IDEA's procedures before filing an action under the Americans with Disabilities Act, the Rehabilitation Act, or similar laws when her suit "seek[s] relief that is also available" under the IDEA. This administrative exhaustion requirement is present "when the gravamen of a complaint seeks redress for a school's failure to provide a [free appropriate public education], even if not phrased or framed in precisely that way." *See id.* In the instant case, Plaintiff has failed to exhaust her administrative remedies prior to bringing the instant action. Accordingly, Plaintiff is unlikely to succeed in her claims against the County Defendants.

      iii.    <u>The County Defendants did not discriminate against Plaintiff on the basis of sex within the meaning of Title IX.</u>

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To establish a Title IX claim, Plaintiff must show that: (1) she was excluded from participation in an education program because of her sex; (2) the educational institution received federal financial assistance at the time of the exclusion; and (3) the discrimination harmed her. *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 865 (S.D. Ohio 2016). In the instant case, Plaintiff cannot show that she was excluded from an education program on the basis of sex.

While the Supreme Court has held that Title VII's prohibition on sex discrimination encompasses gender identity, it has expressly declined to extend this holding beyond Title VII or to restroom access-related challenges. *See Bostock v. Clayton Cnty.*, 1731, 1741, 1753 (2020) ("The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. . . . But none of these other laws are before us . . . and we do not prejudge any such question today. Under Title VII, too, we do not purport to address bathrooms,

locker rooms, or anything else of the kind."); *see also Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("[T]he Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself."); *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) ("[I]t does not follow that principles announced in the Title VII context automatically apply in the Title IX context.").

Despite this clear language, the Department of Education recently issued guidance interpreting *Bostock* as applying to Title IX. *See Tennessee v. United States Dep't of Educ.*, No. 3:21-cv-308, 2022 U.S. Dist. LEXIS 125684, at *7 (E.D. Tenn. July 15, 2022); Enforcement of Title IX of the Education Amendments of 1972 with Respect to Discrimination on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32637 (June 22, 2021). This guidance stated that the Department would "fully enforce Title IX to prohibit discrimination based on . . . gender identity in education programs and activities that receive Federal financial assistance[,]" and that it "replace[d] any prior inconsistent statements made by the Department regarding the scope of Title IX's jurisdiction over discrimination based on…gender identity." 86 Fed. Reg. at 32639.

Shortly after this guidance was issued, a group of States brought suit in the United States District Court for the Eastern District of Tennessee seeking to enjoin enforcement of the guidance alleging, inter alia, that the Department violated the Administrative Procedures Act's ("APA") notice and comment requirements when it promulgated the guidance. *See Tennessee*, 2022 U.S. Dist. LEXIS 125684, at *12, 56–57. The Department of Education took the position that its guidance was merely an interpretive rule not subject to notice and comment. *See id.* at *58. Conversely, the plaintiff States took the position that the guidance was a legislative rule that was required to comply with the APA's notice and comment procedures. *See id.* The distinction

between these two types of rules is that "'[l]egislative rules have the force and effect of law and interpretive rules do not. Thus, a rule that intends to create new law, rights, or duties, is legislative, while a rule that simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties is interpretive.'" *Id.* (quoting *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (U.S. 6th Cir. 2022)).

Thus, in order to determine whether the guidance was interpretive or legislative, the court in *Tennessee* had to first determine whether Title IX's prohibition on sex discrimination encompassed gender identity. *See id.* at *58–59. If Title IX's prohibition of discrimination on the basis of sex included discrimination on the basis of gender identity, then the Department's guidance would not have created any new duties or rights and thus would not have been subject to notice and comment. The Court, however, found the opposite to be true, holding that "the Department of Education's guidance create[d] rights for students and obligations for regulated entities not to discriminate based on . . . gender identity *that appear nowhere in Bostock, Title IX, or its implementing regulations*." *Id.* at *61–62 (emphasis added). Accordingly, the Court found that the guidance was a legislative rule and preliminarily enjoined its enforcement. *See id.* at *61–62, 67–68.

That Title IX's prohibition on sex discrimination does not include gender identity is supported by the text of the Department of Education's recent Proposed Rule to codify the guidance that the District Court enjoined in *Tennessee v. United States Department of Education. See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390 (proposed July 12, 2022) (to be codified at 34 C.F.R. part 106) (comment period ending Sept. 12, 2022). In drafting this Proposed Rule, which was published three days prior to the *Tennessee* decision, the Department of Education seemingly

17

acknowledged what the Court in *Tennessee* later held—that extending Title IX's coverage to gender identity would expand the scope of the statute. Because Title IX's scope must be expanded to encompass gender identity, this necessarily means that gender identity is not *currently* covered by the statute. Accordingly, Plaintiff is unlikely to succeed on the merits of her Title IX claim against the County Defendants.

       iv.   <u>The County Defendants did not violate the Equal Protection Clause of the Fourteenth Amendment.</u>

Plaintiff does not have a "strong likelihood" of succeeding on the merits of her 42 U.S.C. § 1983 claim against WCBOE for alleged violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In Plaintiff's Memorandum in support of her Motion for Preliminary Injunction, Plaintiff argues that she is likely to succeed on the merits of her equal protection claim but, in making such argument, focuses entirely on the classification drawn by the Act. (Doc. 6 at 16-21.) As noted herein, defense of the Act itself is properly left to the Attorney General. With respect to the action of the County Defendants, Plaintiff's equal protection claim fails as a matter of law.

The Equal Protection Clause provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 986 (6th Cir. 2012) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). "[T]o establish an equal protection violation, a plaintiff must establish more than differential treatment alone—a discriminatory intent or purpose is required." *Maye v. Klee,* 915 F.3d 1076, 1085 (6th Cir. 2019). "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious . . . discrimination." *Wash. v. Davis*, 426 U.S. 229, 242 (1976).

In analyzing equal protection claims, courts employ differing levels of scrutiny depending upon the classification at issue. Generally, governmental action is presumed to be valid and will be upheld if it passes rational basis scrutiny—meaning that the classification drawn is rationally related to a legitimate state interest. *See, e.g., City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). However, classifications based on a "suspect class" or "quasi-suspect class" are subject to heightened scrutiny. Specifically, a classification based on a "suspect class," such as race, alienage, or national origin, or that violate a "fundamental right," will be upheld if it passes strict scrutiny, meaning that the governmental action will be sustained only if it is narrowly tailored to serve a compelling government interest. *Koger v. Mohr*, 964 F.3d 532, 544 (6th Cir. 2020). A classification based on a "quasi-suspect" class, such as sex or illegitimacy, is subject to intermediate scrutiny, meaning the governmental action will be upheld if the classification is substantially related to achieving an important government interest. *Ondo v. City of Cleveland*, 795 F.3d 597, 608 (6th Cir. 2015).

While certain district courts have addressed whether classifications based upon transgender status are subject to heightened scrutiny, neither the Sixth Circuit nor this Court have directly addressed the issue. Indeed, as recently as 2015, the Sixth Circuit Court of Appeals has stated:

> The United States Supreme Court has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so. Moreover, the Court has never defined a suspect or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth, such as race or biological gender.

*Ondo*, 795 F.3d at 609. Accordingly, rational basis scrutiny applies to Plaintiff's equal protection claims. However, even if it can be said that intermediate scrutiny applies to Plaintiff's equal protection claim against the County Defendants, Plaintiff does not have a "strong likelihood" of succeeding on the merits of her claim for the reasons outlined below.

The County Defendants did not draw the classification of which Plaintiff complains. Rather, that classification was drawn by a state law that the County Defendants are obligated to follow. The only conduct of the County Defendants at issue is the denial of Plaintiff's request to use multi-occupancy girls' restrooms at the Elementary School, an accommodation that is expressly disallowed by the Act. Clearly, the County Defendants' denial of Plaintiff's request is substantially related to the County Defendants' interest in complying with state law.

Moreover, the County Defendants' denial of Plaintiff's requested accommodation in accordance with state law is substantially related to the important government interest in safeguarding public funds that, as noted by the sponsors of the Act, would undoubtedly be expended as a "consequence" of "violat[ing] state law." House Floor Session – 25th Legislative Day, 112th Tennessee General Assembly, 41:24–42:02 (Apr. 19, 2021), https://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24699&meta_id=595529. Courts have recognized the important government interest in conserving and allocating government resources. *See United States v. Collins*, 683 F.3d 697, 704 (6th Cir. 2012) (identifying a "legitimate government interest in the efficient allocation of government resources"); *Anderson v. Spear*, 356 F.3d 651, 676 (6th Cir. 2004) ("Kentucky's interest in maintaining and managing scarce resources . . . is a significant government interest that justifies access requirements for the fund."); *Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 301 (6th Cir. 1997) (holding that city had "valid" interest in conserving financial resources); *Bell-Bey v. Williams*, 87 F.3d 832, 838 (6th Cir. 1996) (discussing how the management of limited government resources is a substantial government interest); *Lake v. City of Southgate*, No. 16-10251, 2017 U.S. Dist. LEXIS 27623, at *12 (E.D. Mich. Feb. 28, 2017) ("[Defendant] has a legitimate interest in conserving and allocating limited resources[.]"); *see also Shaw v. Hunt*, 517 U.S. 899, 915 (1996)

(assuming, *arguendo*, that compliance with a law to avoid liability under said law was a compelling state interest).

If the County Defendants permitted Plaintiff to use the multi-occupancy girls' restrooms in contravention of the Act, the County Defendants would be exposed to potential lawsuits every time Plaintiff enters a restroom.[8] *See* Tenn. Code Ann. § 49-2-805. Liability in these circumstances would essentially be guaranteed as all that is required for a successful claim under the statute is that: (1) a student, teacher, or public-school employee encounter a member of the opposite sex (defined by the Act in terms of biological sex) in a multi-occupancy restroom; (2) the multi-occupancy restroom where the encounter occurs is designated for the student, teacher, or public-school employee's sex; and (3) the local education authority intentionally allowed the member of the opposite sex to enter the multi-occupancy restroom. *See id.* For every lawsuit lost, the WCBOE would be liable for "monetary damages, including, but not limited to, monetary damages for all psychological, emotional, and physical harm suffered[,]" as well as attorney's fees. Tenn. Code Ann. § 49-2-805(C). The money paid to plaintiffs alleging a violation of the Act would be money that could no longer be spent on textbooks, classroom supplies, and other expenditures directly benefitting students.

Because the County Defendants' denial of Plaintiff's request to use the multi-occupancy girls' restroom at the Elementary School complies with the requirements of the Act, it is clear that the conduct of the County Defendants is substantially related to the important government interest in complying with state law and, relatedly, safeguarding public funds that would be expended as a result of any violation of the Act. Accordingly, Plaintiff does not have a "strong likelihood" of

---

[8]    Plaintiff herself recognizes that this potential liability makes WCBOE "not free to enact policies more inclusive of transgender students allowing them to use restrooms consistent with their gender identity." (Doc. 1 at ¶ 102.)

success on the merits of her equal protection claim against the County Defendants and her Motion for Preliminary Injunction should therefore be denied.

### B. Plaintiff cannot show that failure to preliminarily enjoin the County Defendants would cause irreparable injury.

"When determining whether to issue injunctive relief, a threat of an immediate, irreparable harm must be present." *McLearn v. Wyndham Resort Dev. Corp.*, No. 3:19-cv-00004, 2020 U.S. Dist. LEXIS 42581, at *23 (M.D. Tenn. Mar. 11, 2020) (citing Fed. R. Civ. P. 65(b)(1)(A)). "Not every injury constitutes 'irreparable harm.'" *Livingston Educ. Serv. Agency v. Becerra*, No. 22-cv-10127, 2022 U.S. Dist. LEXIS 66152, at *5 (E.D. Mich. Apr. 8, 2022). In determining whether a party will suffer irreparable harm, courts generally consider "(1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided." *See Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) (citing *Ohio ex rel. Celebrezze v. Nuclear Regulatory Com.*, 812 F.2d 288, 290 (6th Cir. 1987)). In the instant case, Plaintiff will not suffer irreparable harm if the County Defendants are not ordered to allow her to use the multi-occupancy girls' restrooms.

The substantiality of Plaintiff's alleged injury, the likelihood of its occurrence, and the adequacy of Plaintiff's proof are all undermined by the fact that Elementary School staff has, as a result of collaboration with Plaintiff's parents, taken substantial measures to better understand, accommodate, and support Plaintiff during her third-grade year. As noted above, these measures include, but are not limited to, reading materials and attending meetings as suggested by Plaintiff's parents in an effort to better support and understand Plaintiff (K.M. Aff. at ¶ 4), establishing "safe" spaces for Plaintiff and setting specific plans for Plaintiff's teachers and the Elementary School counselor to regularly check in with Plaintiff to see how she is adapting to the new school year (K.M. Aff. at ¶¶ 6, 10), placing a key and ID in Plaintiff's desk that she can use to access the

single-occupancy restroom in the occupational therapy room without having to answer questions or justify her presence in the area (K.M. Aff. at ¶ 7), implementing a plan to ensure that the special education single-occupancy restroom is clean so that Plaintiff feels comfortable using it (K.M. Aff. at ¶ 8), establishing strategies for handling group restroom breaks such that Plaintiff can go to a single-occupancy restroom without arousing the curiosity of her peers (K.M. Aff. at ¶ 9), and training Plaintiff's teachers and staff on behaviors that, if observed, may indicate Plaintiff is experiencing distress so that they can appropriately respond (K.M. at ¶ 11). Each of these measures was informed by Plaintiff's reported concerns and experiences (Doc. 1 at ¶¶ 54-77), and was designed to combat any stigmatization, anxiety, or other discomfort that she may experience, and ensure that any issues which do arise can be promptly addressed, while maintaining compliance with state law. (K.M. Aff. at ¶ 12.) This limits both the likelihood of Plaintiff being harmed and the potential substantiality of that harm.[9]

Because Plaintiff cannot show that she will suffer an irreparable injury absent a preliminary injunction requiring the Elementary School to allow her to use the multi-occupancy girls' restrooms, Plaintiff's Motion for Preliminary Injunction as to the County Defendants should be denied.

---

[9] Plaintiff's contention that she will be harmed should she not be allowed to use the multi-occupancy girls' restrooms is based on her previous experience of being denied access. (Doc. 1 at ¶¶ 54–77.) It is notable that Plaintiff nonetheless asked her parents to allow her to return to the Elementary School, despite having an out of zone waiver for a school with only single-occupant restrooms. Even assuming that Plaintiff's experience last year caused her distress, the Elementary School has implemented a battery of new measures to ensure that Plaintiff feels supported and understood. (K.M. Aff. at ¶¶ 3–12.) These measures have "changed the game" so to speak and, as such, the harms Plaintiff claims to have suffered in the past cannot be used to predict how the newly implemented measures will fare in mitigating the harm alleged by Plaintiff.

**C. It is not in the public interest to issue a preliminary injunction against the County Defendants.**

It would not serve the public interest to grant preliminary injunctive relief requiring the County Defendants to permit Plaintiff to use multi-occupancy girls' restrooms at the Elementary School. When it is the government that opposes injunctive relief, the third and fourth elements for a preliminary injunction merge, and the Court must balance any harm with the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Through its enactment of legislation, the General Assembly is charged with setting the public policy for the State of Tennessee. *Crawford v. Buckner*, 839 S.W.2d 754, 759 (Tenn. 1992) (internal citations omitted); *Hyde v. Hyde*, 562 S.W.2d 194, 196 (Tenn. 1978). In adopting the Act, and in specifically providing a private right of action for violations thereof, the General Assembly has expressed a public policy affording individuals a privacy right not to share a restroom with an individual of the opposite sex as that term is defined in the Act.

It is not for the County Defendants, or any other governmental entity or official, to exercise discretion over a topic in which the General Assembly has specifically legislated. Rather, the public interest clearly weighs in favor of public officials obeying the law. *See West v. Schofield*, 460 S.W.3d 113, 131 (Tenn. 2015) (stating that public officials in Tennessee are "presumed to discharge their duties in good faith and in accordance with the law" (citations omitted)); *see also Chorazghiazad v. City of Mt. Juliet*, 2006 U.S. Dist. LEXIS 10570, at *4 (M.D. Tenn. Oct. 3, 2006) ("[T]he public interest is served by allowing police officers to do that which is allowed under the law."). Accordingly, Plaintiff's request for preliminary injunctive relief which would require the County Defendants to circumvent the Act should be denied.

Plaintiff has asked this Court to both "enjoin [Defendants] from enforcing the 'Tennessee Accommodations for All Children Act,' Tenn. Code Ann. § 49-2-801, *et seq*. . . . **and** permit

Plaintiff to use the multi-occupancy restrooms located within any public school building that correspond with her gender identity, rather than the gender assigned at her birth." (Doc. 5 at 1) (emphasis added). As noted herein, the Act contains a private enforcement provision and if the County Defendants are ordered to allow Plaintiff to use the multi-occupancy girls' restrooms, but the Act is not enjoined in its entirety, the County Defendants will be exposed to potential lawsuits every time Plaintiff enters a restroom. Accordingly, while the County Defendants do not believe injunctive relief is warranted; if the Court decides to grant Plaintiff a preliminary injunction allowing her to use the multi-occupancy girls' restrooms, it should also enjoin enforcement of the Act in its entirety, so that WCBOE will not be subject to civil liability for following this Court's orders.

## **CONCLUSION**

For the foregoing reasons, the County Defendants respectfully request that Plaintiff's Motion for a Preliminary Injunction be denied. Alternatively, should the Court decide that a preliminary injunction is warranted, the County Defendants request that it grant Plaintiff's preliminary injunction in its entirety so as to prevent WCBOE from being subjected to civil liability for complying with this Court's order.

Respectfully submitted,

/s/Lisa M. Carson
Lisa M. Carson, BPR# 14782
Courtney M. King, BPR# 35625
**BUERGER, MOSELEY & CARSON, PLC**
*Attorneys for Defendants Williamson County*
*Board of Education and Jason Golden*
306 Public Square
Franklin, TN 37064
Telephone: (615) 794-8850
lcarson@buergerlaw.com
cking@buergerlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been delivered electronically via the Court's electronic filing system, to Attorneys for Plaintiff, Tricia Herzfeld, Branstetter Stranch & Jennings PLLC, 223 Rosa L. Parks Avenue, Suite 200, Nashville Tennessee, 37203, Adam S. Lurie, Sean Mooney, and Benjamin Kurland, LINKLATERS LLP, 1290 Avenue of the Americas, New York, New York, 10104, and Jason Starr and Ami Patel, Human Rights Campaign Foundation, 1640 Rhode Island Avenue NW, Washington, D.C. 20036, and electronically and via U.S. Mail to Alexander S. Rieger and Jeffrey Cadle, Attorney General's Office for the State of Tennessee, P.O. Box 2027, Nashville, Tennessee 37202 on this the 16th day of August, 2022.

/s/ Lisa M. Carson
Lisa M. Carson