**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **D.H., a minor, by her next friends A.H., mother, and E.H. father,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **NO. 3:22-cv-00570** |
| **WILLIAMSON COUNTY BOARD OF** ) | |
| **EDUCATION, JASON GOLDEN, in his** ) | **JUDGE CAMPBELL** |
| **official capacity as Director of the** ) | **MAGISTRATE JUDGE FRENSLEY** |
| **Williamson County Schools,** ) | |
| **TENNESSEE DEPARTMENT OF** ) | |
| **EDUCATION; and PENNY SCHWINN,** ) | |
| **in her official capacity as Commissioner** ) | |
| **of the Tennessee Department of** ) | |
| **Education,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM

Plaintiff D.H. is an eight-year-old transgender girl.[1] She attends third grade at a public elementary school (the "elementary school") in Williamson County, Tennessee. Due to potential liability created by the Tennessee Accommodations for All Children Act, Tenn. Code Ann. § 49-2-801, *et seq.* (the "Act"), the elementary school does not allow D.H. to use the multi-occupancy girls' restroom. Shortly before the start of the school year, Plaintiff filed this action against the Williamson County Board of Education ("WCBOE") and Jason Golden, Director of Williamson County Public Schools, (collectively the "Williamson County Defendants"), and Tennessee Department of Education and Penny Schwinn, Commissioner of the Tennessee Department of

---

[1] The Court uses D.H.'s preferred pronouns (she/her/hers) throughout. The Williamson County Defendants also use Plaintiff's preferred pronouns, as they have committed to doing with D.H. in school. (*See* Doc. No. 28, ¶ 9 ("all adults in the Elementary School referred to D.H. by her preferred pronouns (she/her/hers)"). The Tennessee Defendants did not use *any* pronouns.

Education, (collectively, "the Tennessee Defendants"), challenging the Act as violative of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

Before the Court is Plaintiff's Motion for a Preliminary Injunction. (Doc. No. 5). Plaintiff seeks a preliminary order preventing Defendants from enforcing the Act and requiring them to allow Plaintiff to use the multi-occupancy girls' restroom at the elementary school. In support of the Motion, Plaintiff submitted a memorandum of law (Doc. No. 6), and two declarations from her mother, A.H. (Doc. Nos. 7, 36). The Williamson County Defendants filed a response in opposition (Doc. No. 27), and declarations from the former and current principals of D.H.'s elementary school (Doc. Nos. 28, 29). The Tennessee Defendants filed a separate response. (Doc. No. 30). Plaintiff filed a consolidated Reply. (Doc. No. 35).

## I.    BACKGROUND

### A.  The Act

Tennessee enacted the Tennessee Accommodations for All Children Act in May 2021. As applicable to the instant motion, the Act operates by requiring public schools, "to the extent practicable," to provide a "reasonable accommodation" to a student, teacher, or employee who "[d]esires greater privacy when using a multi-occupancy restroom or changing facility designated for [their] sex and located within a public school building." Tenn. Code Ann. § 49-2-803. The Act defines a "reasonable accommodation" as follows:

> "Reasonable accommodation" includes, but is not limited to, access to a single-occupancy restroom or changing facility or use of an employee restroom or changing facility. "Reasonable accommodation" does not include the following:
>
> (A)    Access to a restroom or changing facility that is designated for use by members of the opposite sex while members of the opposite sex are present or could be present;

2

(B)     Requesting that a school construct, remodel, or in any way perform physical or structural changes to a school facility; or

(C)     Requesting that a school limit access to a restroom or changing facility that is designated for use by members of the opposite sex, if limiting access results in a violation of state or local building codes or standards[.]

Tenn. Code Ann. § 49-2-802(2). The Act defines "sex" to mean "a person's immutable biological sex as determined by anatomy and genetics existing at the time of birth." *Id*. § 49-2-802(4).

Finally, the Act provides students, their parents or legal guardians, teachers, and employees a private right of action to sue public school systems for "psychological, emotional, and physical harm," including monetary damages and "reasonable attorney fees and costs," if they "encounter[] a member of the opposite sex [defined as sex at birth] in a multi-occupancy restroom or changing facility located in a public school building … [and] the public school intentionally allowed a member of the opposite sex [defined as sex at birth] to enter the multi-occupancy restroom or changing facility while other persons were present." Tenn. Code Ann. § 49-2-805(1)(A)-(C).

## B.  Sex and Gender Identity

The Court is aware of the progressing conversations regarding sex and gender identity. Indeed, scientific knowledge, whether about human biology or other areas of scientific inquiry, is cumulative and evolving. *See* National Academy of Sciences, Engineering, and Medicine, *Reproducibility and Replicability in Science* 5-6 (2019), https://doi.org/10.17226/25303# (explaining that the scientific process "may confirm and extend existing knowledge, or it may upend previous knowledge and replace it with more accurate scientific understanding of the natural world"). Although other courts have considered issues concerning sex and gender identity with the benefit of scientific background from various experts, the parties have not filed expert reports or other scientific evidence in this case. Plaintiff has, however, cited a number of publications and

3

amicus briefs that were filed in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), and other reports and journal articles.

A basic understanding of sex and gender identity as those terms are currently used in the scientific community will assist the understanding of the issues presented in this case. Absent expert testimony to define these terms, the Court turns to the definitions provided by the American Psychiatric Association, which appear to reflect current usage of these terms in the scientific community and are in accord with the scientific testimony recently provided in other cases. *See e.g.*, *Bongo Productions, LLC v. Lawrence*, No. 3:21-cv-00490, __ F.Supp.3d __, 2022 WL 1557664, at * 6-8 (M.D. Tenn. May 17, 2022); *Grimm*, 972 F.3d at 594-597; Eli Coleman et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People*, World Prof'l Ass'n for Transgender Health (WPATH) (7th Version 2012).[2]

The American Psychiatric Association explains that "sex" and "gender" are often used interchangeably, but they are distinct terms.[3] "Sex" ordinarily refers to biological sex as determined based on anatomy and other biological factors. "Gender" is more accurately stated as "gender identity" or "gender expression."[4] As relevant here, "gender identity" is a person's inner sense of being a particular gender.[5] "In a human context, the distinction between gender and sex reflects the usage of these terms: Sex usually refers to the biological aspects of maleness or

---

[2]     The World Professional Association for Transgender Health (WPATH), Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People (7th Version 2012) is available at https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English.pdf.

[3]     *See* "What is Gender Dysphoria? – Terminology," American Psychiatric Association, www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria.

[4]     *Id.*

[5]     *See id.* ("**Gender identity**: A person's inner sense of being a girl/woman, boy/man, some combination of both, or something else, including having no gender at all. This may or may not correspond to one's sex assigned at birth.").

4

femaleness, whereas gender implies the psychological, behavioral, social, and cultural aspects of being male or female (i.e. masculinity or femininity)."[6] For the vast majority of people, gender identity is consistent with the biological sex they were assigned at birth.[7] A transgender individual is one whose gender identity does not align with their biological sex.[8] As stated by Judge Trauger in another case concerning this topic, "[a]lthough there may be disagreement among people about the normative question of what role gender identity should play in various situations, the purely descriptive fact that gender identity, as a type of internally experienced and reported phenomenon, *exists* is supported by both medical research and, at least for many people, confirmed by the ordinary experience of being a human." *Bongo Productions, LLC v. Lawrence*, No. 3:21-cv-00490, __ F.Supp.3d __, 2022 WL 1557664, at * 7 (M.D. Tenn. May 17, 2022) (emphasis in original).

## C. D.H.

D.H. is an eight-year-old transgender girl in third grade at the elementary school in Williamson County, Tennessee. (Compl., Doc. No. 1, ¶ 2). D.H. is experiencing an adjustment disorder, which her psychologist links to her inability to live her life fully as a girl in all respects, including the inability to use the girls' restroom at school. (A.H. Decl., Doc. No. 7, ¶ 18). D.H.'s

---

[6]    APA Dictionary of Psychology, defining "gender" and "sex," www.dictionary.apa.org/gender and www.dictionary.apa.org/sex.

[7]    Recent reports state that transgender individuals constitute somewhere between 0.5% and 1.4% of the U.S. population. *See* Allen, Jonathan. "New Study Estimates 1.6 Million in U.S. Identify as Transgender," Reuters (June 10, 2022); https://www.reuters.com/world/us/new-study-estimates-16-million-us-identify-transgender-2022-06-10/. *See Bongo Productions, LLC v. Lawrence*, 2022 WL 1557664, at *7 (M.D. Tenn. May 17, 2022) (citing expert report stating that about 31,000 transgender people live in Tennessee, amounting to 0.6% of the state's population); *Grimm*, 972 F.3d at 594 (citing expert report stating that approximately 0.6% of the United States adult population is transgender).

[8]    *See supra* n.3.

5

adjustment disorder materializes in symptoms such as regurgitation, migraines, and nightmares. (*Id.*).

D.H. attended the same elementary school for kindergarten. In kindergarten, she presented as a boy and used he/him pronouns. She began her social transition in the spring of 2020 during the COVID pandemic and did not attend school in-person using she/her pronouns until first grade (the 2020-2021 school year). (Compl., Doc. No. 1, ¶ 3). In second grade, due to concerns about COVID-19, D.H. attended online school for the first part of the year, and returned to the elementary school in person from January to May 2022. (A.H. Decl., Doc. No. 7, ¶¶ 25-27). She was provided access to the school's four single occupancy restrooms, but was not permitted to use the multi-occupancy girls' restroom. (Compl., Doc. No. 1, ¶¶ 58-59). Plaintiff claims the four single-occupancy restrooms presented concerns. One was far from her classroom, others were unhygienic and unpredictably unavailable or located in places not typically open to students so that she was forced to out herself to staff, and another was outside the school's lockdown zone, which raised safety concerns. (*Id.*, ¶¶59-63; A.H. Decl., Doc. No. 7, ¶ 38).

Teachers often took the whole class to the restrooms at once. (A.H. Decl., Doc. No. 7, ¶ 42). When this happened, D.H. was the only student required to use a separate restroom facility. Plaintiff began limiting the amount she ate or drank at school to minimize the need to use the restroom during the day. (Compl., Doc. No. 1, ¶ 50). On one occasion, Plaintiff's mother had to pick her up from school because she was not using the restroom. (*Id.*, ¶ 68). To help avoid D.H. feeling singled out for not using the multi-occupancy restrooms, when the class went to the restrooms as a group, a small group of male and female students, including D.H., would be sent to a single-occupancy restroom. (J.J. Aff., Doc. No. 28, ¶ 6).

6

Plaintiff alleges she has been subjected to bullying and harassment at school and at the bus stop and has been frequently misgendered by her classmates and teachers. (Compl., Doc. No. 1, ¶¶ 50-52, 70-71). D.H.'s parents stated that after she returned to in-person school, her behavior noticeably changed. (A.H. Decl., Doc. No. 7, ¶ 53). D.H. began having screaming fits, throwing objects, engaging in negative self-talk, and hitting herself. (*Id*., ¶ 54). She also became apathetic and lethargic at times, and experienced migraines, and recurring nightmares. (*Id*., ¶¶ 55-56).

In response to reports from D.H.'s mother that D.H. was bullied and subjected to comments that made D.H. feel uncomfortable, the elementary school counselor, who D.H. identified as a "safe" person, began checking in with D.H. daily. (J.J. Aff., Doc. No. 28, ¶ 8). A teacher's assistant with whom D.H. felt comfortable also began checking in and, at the request of D.H.'s mother, the principal and D.H.'s second grade teacher attended a PFLAG meeting about school issues, including bathroom facility issues.[9] (*Id*. ¶¶ 9, 10).

These efforts appear to have helped, if not resolved the problems. At the end of the school year, D.H.'s mother thanked the principal for her efforts to support D.H. during the school year. (Doc. No. 28, Ex. 1). She wrote: "Your action has allowed D.H. to finish her year out with much improvement. She is using the bathroom more and no longer reports kids talking to her about her assigned sex at birth. Her nightmares have subsided and soon we will see if her tummy has healed. We will spend some time this summer processing those early hurts so they do not stay with her." (*Id*.). D.H.'s mother states that D.H.'s behavior symptoms abated during the summer vacation. (A.H. Decl., Doc. No. 7, ¶ 58).

---

[9]     PFLAG is an organization that provides support to families and friends of lesbian, gay, bisexual, and transgender people. *See* PFLAG Nashville, www.pflagnashville.org/about-pflag/ ("Our purpose is to confidentially help people understand sexual orientation and gender identity/expression while helping to raise awareness an acceptance in the community.").

7

For third grade, D.H.'s parents initially enrolled her in a public elementary school designed with only single-occupancy restrooms. (*Id*. ¶ 66). The family ultimately decided to re-enroll in the elementary school in part because there was no bus service to the other school and driving D.H. to school each day would have been a hardship; and in part because D.H. expressed a strong preference to return to the elementary school for the third grade. (*Id*. ¶¶ 67-68).

The current principal of the elementary school stated that the school has taken action to be supportive to D.H. and understand her needs. The principal and D.H.'s two academic teachers are reading books recommended by D.H.'s parents in order to better understand and support her. (K.M. Aff., Doc. No. 29 ¶ 4). Shortly before school started, they and the school counselor met with D.H.'s parents for over three hours to discuss how D.H. would be accommodated and supported. (*Id*. ¶ 5). The principal also met with D.H.'s teachers, one of whom has experience working with transgender students, and the counseling staff to discuss proactive strategies to address D.H.'s needs. (*Id*., ¶¶ 5-6). The elementary school has planned for D.H.'s teachers and counselor to regularly check in with her to ensure she is adapting well in third grade. (*Id*.).

With regard to bathroom access, D.H. is still not permitted to use the multi-occupancy girls restroom. If D.H. needs to use the restroom during a group restroom break, the teacher will give her an "errand" to run that will take her in the direction of an available restroom. (Doc. No. 29 ¶ 9). She has a key to access a single occupancy restroom near her classroom and an identification card indicating that she has permission to use that restroom. (Doc. No. 29 ¶ 7). D.H. also has access to the single-occupancy special education restroom, which will be cleaned twice a day (before school and while D.H. is at recess), and spot checked for cleanliness. (*Id*. ¶ 8).

Plaintiff contends that being forced to use separate restroom facilities ostracizes her from her peers and exacerbates her feelings of isolation and differentness. (Doc. No. 6 at 10). Her mother

8

states that D.H. is showing signs of internalized transphobic thoughts, which the mother attributes to other children fixating on D.H.'s restroom use and her inability to use the girls' restroom. (A.H. Decl., Doc. No. 7 ¶ 57). D.H.'s psychologist linked all of D.H.'s physical symptoms and emotional suffering to the discriminatory treatment and harassment to which D.H. is subjected because she is transgender. (*Id*. ¶ 59). D.H.'s mother fears that D.H. is at risk of experiencing major depression and suicidal thought because of the discrimination she faces at school by not being able to use the girls' restroom, as well as the bullying and harassment she experiences at school. (*Id*. ¶ 62).

## II.    ANALYSIS

Plaintiff argues the Act is invalid because it violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* (Complaint, Doc. No. 1). She seeks a preliminary injunction enjoining the Act as a whole, including the private enforcement provision, and requiring Defendants to allow her to use the multi-occupancy girls' restroom at the elementary school. (Doc. No. 5).

## A.  Standard of Review

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (emphasis in original) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see also*, *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) ("A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."). The movant "faces a burden of proof 'more

stringent than the proof required to survive a summary judgment motion.'" *Enchant*, 958 F.3d at 539 (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)).

In determining whether to issue a preliminary injunction under Federal Rule of Civil Procedure 65, the Court considers: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff is likely to suffer irreparable harm absent the injunction; (3) the balance of equities; and (4) the impact of the injunction on the public interest. *See, e.g., Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). While these factors are a balancing test, "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." *D.T. v. Sumner Cty. Sch.,* 942 F.3d 324, 326-27 (6th Cir. 2019) (internal quotations omitted). Likewise, a failure to establish a likelihood of success on the merits "'is usually fatal' to a plaintiff's request for preliminary injunction." *Enchant*, 958 F.3d at 539 (quoting *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)).

As discussed herein, the Court finds Plaintiff has not met her burden to show the circumstances clearly warrant preliminary injunctive relief.[10]

## B. Likelihood of Success on the Merits

In cases concerning claims of employment discrimination under Title VII, the Supreme Court and the Sixth Circuit have held that discrimination for being transgender is discrimination on the basis of sex. *See Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1741 (2020) (noting that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex"); *E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 578 (6th Cir. 2018) ("[I]t is analytically impossible to fire an employee

---

[10] In light of this disposition, the Court will not address the Defendants' arguments related to Plaintiff's alleged failure to exhaust administrative remedies, or the timeliness of her request for injunctive relief. Nor does the Court consider whether the Tennessee Defendants may be enjoined from "enforcing" the Act.

10

based on that employee's status as a transgender person without being motivated, at least in part, by the employee's sex."). The Supreme Court, however, expressly limited its decision in *Bostock* to consideration of "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex,'" noting that an individual's transgender status is not relevant to employment decisions. *Bostock*, 140 S. Ct. at 1741, 1753. The Court expressly declined to address "bathrooms, locker rooms, or anything of the kind." *Id.* at 1753. The Sixth Circuit has cautioned against applying *Bostock* outside the context of Title VII. *See Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (declining to apply the causation standard from *Bostock* to an ADEA claim, noting, "the Court in Bostock was clear on the narrow reach of its decision and how it was limited only to Title VII itself."); *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) ("[I]t does not follow that principles announced in the Title VII context automatically apply in the Title IX context.").

Although certain district and appellate courts have squarely considered whether designating restrooms by sex and limiting access to individuals of the corresponding biological sex is impermissible discrimination against individuals whose gender identity does not align with their biological sex, neither the Sixth Circuit nor the Supreme Court have reached the merits of this question.[11]

Plaintiff suggests the Sixth Circuit's decision in *Dodds v. United States Department of Education*, 845 F.3d 217 (2016), which involved a similar factual scenario – an eleven-year-old

---

[11]     The Fourth, Seventh, and Eleventh Circuits have considered this issue. *See Adams v. School Bd. of St. Johns Cty., Fla.*, 3 F.4th 1299 (11th Cir. 2021), *vacated pending rehearing en banc*, 9 F.4fth 1369 (11th Cir. 2021); *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020); *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Ed.*, 858 F.3d 1034 (7th Cir. 2017), *abrogation recognized by Ill. Rep. Party v. Pritzker*, 858 F.3d 1034, (7th Cir. 2020).

transgender girl who sought to use the restroom corresponding with her gender identity – should guide the Court's decision in this case. In that case, the district court granted the plaintiff's request for a preliminary injunction, finding she showed a likelihood of success on the merits her claims under Title IX and the Equal Protection Clause. *See Bd. of Ed. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp.3d 850 (S.D. Ohio 2016).[12]

On appeal, the Sixth Circuit denied the school district's motion to stay the preliminary injunction. *Dodds*, 845 F.3d at 220-22. However, Plaintiff's suggestion that the Court found that the school district was "unlikely to succeed on the merits of their appeal [of the preliminary injunction order]" lacks important precision. (*See* Pl. Br., Doc. No. 6 at 13). The burden to show a stay is warranted was on the petitioner to show a *likelihood* of success on appeal. The Court "was not convinced" that [the school district] had made its required showing on that element, which is somewhat different from finding they were *unlikely* to succeed on the merits of the appeal. *See Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991) (explaining that the district court's decision regarding whether to grant a preliminary injunction is "generally afforded great deference"). Although the appellate court considers the same factors considered in evaluating the granting of a preliminary injunction, the balancing is not the same due to the different procedural posture. *Id*.

---

[12]     On appeal, the case caption reflects the name of the Superintendent of the Highlands Local School District, William Dodds.

Notably, the district court in *Highland* gave controlling weight to the Department of Education's guidance regarding interpretation of Title IX and its implementing regulations. 208 F. Supp.3d at 854-55. At the time, this guidance specifically directed that "when a school provides sex-segregated activities and facilities, transgender students must be allowed to participate in such activities and access such facilities consistent with their gender identity." *Id.* (citing guidance issued by the Department of Education between 2010 and 2016). The guidance cited by the *Highland* court is no longer in effect, and Plaintiff does not seek to enforce any subsequent guidance.

12

Moreover, in *Dodds*, the Court found none of the other considerations for granting a stay counseled in favor of a stay – the school district did not show it would suffer irreparable harm absent a stay, and the disruption of imposing a stay would cause irreparable harm to the student. 845 F.3d at 221-22. The *Dodds* Court's finding that the school district did not make its required showing of a likelihood of success on appeal, does not equate to a holding that the failure to allow individuals to use the restroom corresponding with their gender identity is a violation of equal protection or Title IX. The Court proceeds to consider whether Plaintiff has established a likelihood of success on the merits of either claim.

    1.  <u>Equal Protection</u>

The Equal Protection Clause "is 'essentially a direction that all persons similarly situated should be treated alike.'" *Andrews v. City of Mentor*, 11 F.4th 462, 473 (6th Cir. 2021) (quoting *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 864 (6th Cir. 2012)). "The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Rondigo, LLC v. Township of Richmond*, 641 F.3d 673, 681-82 (6th Cir. 2011). The level of scrutiny a distinction receives depends on the nature of the distinction. "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Under this deferential standard, the law must be upheld if there is "any reasonably conceivable" set of facts that could provide a rational basis for the classification, and the state need not present any evidence. *FCC v. Beach Comm., Inc.*, 508 U.S. 307, 313 (1993).

13

Certain classifications mandate heightened scrutiny. "Suspect" classifications based on race, alienage, or national origin, and laws that burden fundamental rights are subject to strict scrutiny and will be deemed constitutional only if they are narrowly tailored to serve a compelling state interest. *Id*. "Quasi-suspect" classifications are subject to intermediate scrutiny. Under intermediate scrutiny, a challenged classification will be sustained so long as it is "substantially related to an important government objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Classifications based on sex have long been recognized as a quasi-suspect classification. *See City of Cleburne*, 473 U.S. at 440 (affirming that sex "generally provides no sensible ground for differential treatment"); *J.E.B. v. Alabama ex rel. T.B*., 511 U.S. 127 (1994); *United States v. Virginia*, 518 U.S. 515 (1996).

The Williamson County Defendants argue that the Act is subject only to rational basis review because the Sixth Circuit has not recognized transgender individuals as a suspect or quasi-suspect class. (Doc. No. 27 at 19 (citing *Ondo v. City of Cleveland*, 795 F.3d 597, 608 (6th Cir. 2015) (noting that the Sixth Circuit "has never defined a suspect or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth, such as race or biological gender"))). Plaintiff and the Tennessee Defendants agree that intermediate scrutiny is the appropriate classification, but disagree as to the reason and the result. For their part, the Tennessee Defendants contend the classification at issue is based on sex because the bathroom usage is assigned based on biological sex without regard to a person's gender identity. Plaintiff argues that the Tennessee Defendants' characterization of the classification ignores the existence of transgender individuals altogether. What Plaintiff is challenging is not the designation of male and female restrooms, but the policy regarding who can use these restrooms – *i.e.*, the policy that students may only use the restroom corresponding with their biological sex as determined by

anatomy and genetics at the time of birth. In other words, Plaintiff challenges the policy that defines who is male and who is female for purposes of restroom usage.

The Court finds Plaintiff has the better argument. The classification at issue is not the designation of bathrooms as male and female, but who is entitled to use those bathrooms. The policy states that this must be determined based on anatomy and genetics at the time of birth, without regard to an individual's gender identity. Neither the Sixth Circuit nor the Supreme Court has determined whether transgender individuals are a suspect or quasi-suspect group, and the Court need not do so now. The parties have not provided any analysis or argument concerning the factors the Supreme Court has considered to determine whether a class of persons is a quasi-suspect class, and Plaintiff and the Tennessee Defendants appear to agree, if not for the same reasons, that the classification at issue is a sex-based classification warranting intermediate scrutiny.[13]

Plaintiff's equal protection challenge is directed at the Tennessee Accommodations for All Children Act. The question then is whether the challenged classification is "substantially related to an important government objective." *See Clark*, 486 U.S. at 461; *Virginia*, 518 U.S. at 533. For ease of discussion, the Court refers to the policy as it applies to D.H. – limiting use of the girls' restroom to individuals who are "biologically female" "as determined based on anatomy and genetics at the time of birth," thereby excluding transgender girls and women. The policy, of course is not limited to excluding transgender girls from the girls' restroom; it also excludes transgender boys and men from using the boys' restroom.

---

[13]     The Supreme Court has suggested consideration of four factors to determine whether a class of persons is quasi-suspect class: (1) whether the class has been historically "subjected to discrimination;" (2) whether the class exhibits "immutable[] or distinguishing characteristics that define them as a discrete group;" (3) whether a defining characteristic of the class has any relationship to the ability of its members to perform and contribute to society; and (4) whether the class is a "minority or politically powerless." *See Lyng v. Castillo*, 477 U.S. 635, 638, (1986); *City of Cleburne*, 473 U.S. at 440-41.#

15

As an initial matter, the Tennessee Defendants argue Plaintiff's challenge to the Act is misplaced because the Act itself does not require schools to adopt any specific policy. The Williamson County Defendants disagree, arguing that they adopted the policy at issue specifically in response to the Act and to the potential for civil liability if they allow D.H. to use the girls' restroom. The Williamson County Defendants do not attempt to defend the constitutionality of the Act, leaving defense of the Act to the Tennessee Attorney General.

The Court agrees with Plaintiff and the Williamson County Defendants that the school's refusal to allow D.H. to use the girls' restroom is the direct (and likely intended) result of the Act. The Act specifically prohibits schools from allowing transgender individuals to access a multi-occupancy restroom corresponding with their gender identity "while members of the opposite sex are present or could be present." Tenn. Code Ann. § 49-2-802(2)(A). In addition, the Act provides for a private right of action for anyone who encounters a member of the opposite sex as determined at birth, which necessarily includes transgender persons, in a restroom in a public school building, thereby exposing school districts to financial liability if they fail to establish policies in conformity with the Act. *See* Tenn. Code Ann. § 49-2-805.

Defendants assert the law is substantially related to the important interests of privacy and safety. With regard to safety, the State Defendants contend there is "risk associated with mixing the biological sexes in unsupervised areas where heightened bodily exposure is inherent." (Doc. No. 30 at 15). As evidence of the alleged safety risk, they note that in Metro Nashville public schools documentation from 2012 to 2016 shows "over 950 instances of sexual harassment, over 1200 instances of inappropriate sexual behavior, 45 instances of sexual assault, and 218 instances of inappropriate sexual conduct." (Doc. No. 30 at 15 (citing *Doe v. Metropolitan Gov't of Nashville and Davidson Cty.*, 35 F.4th 459, 464 (6th Cir. 2022))). Defendants contend "many of [these

incidents] occurred in the bathrooms." While it is likely true that some of these instances occurred in bathrooms, *Doe* does not provide this information, nor was the sexual conduct described in *Doe* related to students' use of the restroom for its intended purpose. Even if it were the case, there is no information to suggest that transgender students were involved in *any* of these incidents.

Moreover, Defendants' suggestion that transgender students seek access to restrooms corresponding to their gender identity for any reason other than that which everyone else seeks to use the restroom is entirely speculative and is indicative of precisely the kind of prejudice of which Plaintiff accuses them. Defendants do not cite to any evidence that allowing transgender individuals – in this case an eight-year-old – to use the restroom corresponding with their gender identity poses any threat to the safety of others in the restroom.

Defendants are correct that courts have long recognized an interest in bodily privacy. However, the cases cited by the Tennessee Defendants provide little insight to the privacy interests implicated by students using the restroom at the elementary school, which the Court presumes takes place in the usual way – behind a stall door.[14] *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 613 (4th Cir. 2020) (quoting *Whitaker*, 858 F.3d at 1052) ("No one questions that

---

[14] The cases cited by Defendants in support of their privacy argument are not particularly applicable to the circumstances of this case. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 606 (1989) (concerning privacy interests implicated by requiring railway employees to submit to urine tests, the Court noted that "[A]lthough urine tests require employees to perform an excretory function traditionally shielded by great privacy, the regulations reduce the intrusiveness of the collection process by requiring that samples be furnished in a medical environment without direct observation."); *Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 604 (6th Cir. 2005) (strip search of students without individualized suspicion was an unreasonable search); *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981) (female prisoner was forcibly stripped of her undergarments in the presence of male guards); *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (in a case concerning accusations by male prisoners that female guards inappropriately viewed them showering and using the toilet, the court recognized that prisoners have a limited constitutional right to bodily privacy "because most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'").

17

students have a privacy interest in their body when they go to the bathroom. But the Board ignores how a transgender child uses the bathroom: 'by entering a stall and closing the door.'").

Nevertheless, separate bathrooms for the biological sexes have been accepted as a valid differentiation that serves the interest of individual privacy. Indeed, it is because of the physical differences between the sexes that sex-based classifications are not entirely proscribed. *See Virginia*, 518 U.S. at 533. Even if the actual risk of exposure of private areas of the body is minimal during typical restroom use, the interest in privacy extends beyond avoiding unwanted genital exposure, to a privacy interest in "perform[ing] personal bodily functions" away from those of the opposite sex. *See* Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21 (available at https://wapo.st/3C87hYo) (recognizing that in some situations "separate places to disrobe, sleep, perform personal bodily functions are permitted … by regard for individual privacy"); *see also*, *Virginia*, 518 U.S. at 550 n.19 (recognizing that admitting women to Virginia Military Institute, which was at the time an all-male school "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements"); *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908, 913 (7th Cir. 2010) (recognizing that sex-based preferences are permissible to accommodate patients' privacy interests in the health care setting and noting that "the law tolerates same-sex restrooms or same-sex dressing rooms … to accommodate privacy needs…"); *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993) (noting "society's undisputed approval of separate public restrooms for men and women based on privacy concerns" and explaining that "distinctions in any separate facilities provided for males and females may be based on real difference between the sexes, both in quality and quantity, so long as the distinctions are not based on stereotyped or generalized perceptions of differences").

Given the long history of allowing separate bathroom facilities based on sex, the Court cannot say that it violates the principles of equal protection for the state to impose a sex-based classification which requires individuals in public school buildings to use the restroom corresponding with their biological sex. Accordingly, at this juncture, the Court finds Plaintiff has not shown she is likely to succeed on her equal protection claim.

2. <u>Title IX</u>

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To establish a claim for violation of Title IX, Plaintiff must show that: (1) she was excluded from participation in an education program because of her sex; (2) the educational institution received federal financial assistance at the time of the exclusion; and (3) the discrimination harmed her. *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 865 (S.D. Ohio 2016); *Grimm*, 972 F.3d at 616.

Plaintiff argues that because the Act prevents her from using the multi-occupancy restrooms that comport with her gender identity, she is excluded from an education program for the purpose of Title IX and suffers discrimination on the basis of sex. (Doc. No. 6 at 12). However, under Title IX, not all differential treatment on the basis of sex is prohibited. As relevant here, the statute expressly provides that "nothing contained herein shall be construed to prohibit [schools] from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. The implementing regulations concerning that provision confirm that institutions "may provide separate toilets, locker room, and shower facilities on the basis of sex," so long as the "facilities

19

provided for students of one sex [are] comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

Plaintiff contends this specific allowance for separate restroom for different sexes is "a misguided strawperson," because she is "not challenging the existence of separate, gender-designated facilities *per se*, but rather her discriminatory exclusion from the gender-designated facility that corresponds to her gender identity for no reason other than that she is transgender." (Doc. No. 35 at 5). She argues that discrimination against a person for being transgender constitutes discrimination on the basis of sex. (Doc. No. 6 at 12-13).

The Court does not disagree that discriminating against a person for being transgender constitutes discrimination on the basis of sex. Indeed, even before the Supreme Court decision in *Bostock*, 140 S. Ct. 1731 (2020), the Sixth Circuit recognized that discriminating against a person based on their gender non-conformity constitutes "discrimination 'because of sex.'" *See Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004), *E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 578 (6th Cir. 2018). Even so, Title IX is clear that not all differentiation based on sex is impermissible discrimination – specifically the provision of separate bathrooms.

Acceptance of Plaintiff's argument requires either that Title IX allows for the provision of separate bathrooms, but does not mandate who may use them, or that "sex" encompasses "gender identity." The Court is not persuaded by either of these readings of the statute. First, the statute states that educational institutions are not prohibited from "maintaining separate living facilities *for* the different sexes." 20 U.S.C. § 1686 (emphasis added). Any argument that the statute merely allows for the existence of separate restrooms, but does not allow schools to limit access to the restroom to the sex for which it is designated is untenable and appears to contradict the very purpose of allowing separate facilities.

Although Title IX and the implementing regulations do not define "sex," Plaintiff's proposed construction conflates sex, gender, and gender identity, which are generally considered to have distinct meanings.[15] *See supra* I.B. "Sex" generally refers to biological sex. *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 632 (4th Cir. 2020), cert. denied, 141 S. Ct. 2878 (2021) (Niemeyer, J. dissenting) (finding the ordinary meaning of "sex" refers to "the *physiological* distinctions between males and females") (collecting dictionary definitions). Absent indication that "sex," as it is used in the statute, means something more expansive that "biological sex," the Court presumes "sex" has its ordinary meaning.[16] The conclusion that "sex" refers to biological sex does not mean that discrimination for being transgender is not discrimination based on sex. In this context, it merely means that provision of separate restrooms for the different biological sexes is not a violation of the statute.

In light of the plain language of Title IX and the implementing regulations, Plaintiff has not shown she is likely to prevail on the merits of her claim for violation of Title IX.

## C. Irreparable Harm

Plaintiff contends that being the only known student who cannot use facilities that correspond with her gender identity threatens both psychological and physical harm. (Doc. No. 6 at 15). She states that she has been bullied, harassed, isolated, and ostracized; suffered from

---

[15]     Indeed, Plaintiff's brief acknowledges that sex and gender identity are not the same. (*See* Doc. No. 6 at 5 (stating that transgender people experience a "gender identity incongruent with their assigned sex.")).

[16]     From time to time, the Department of Education and the Department of Justice have issued guidance regarding Title IX's prohibition on discrimination on the basis of sex as it relates to transgender students. This topic in particular has been the subject of changing policy positions. Plaintiff, however, does not seek to enforce any particular guidance and, in evaluating the request for preliminary injunctive relief the Court relies only on the language of the statute and the implementing regulations now in effect.

depression, anxiety, migraines, regurgitation, nightmares, and internalized transphobic thoughts; and limited her food and water intake threatening dehydration and other health problems. (A.H. Decl., Doc. No. 7, ¶¶ 53-58). These symptoms abated during the summer vacation. (*Id*., ¶ 58).

"D.H.'s psychologist has linked her adjustment disorder to her inability to live her life fully as a girl in all respects, which has been aggravated in particular by her inability to use the girls' restroom at school." (A.H. Decl., Doc. No. 7, ¶ 18). Plaintiff explains that using the single-occupancy restroom is harmful because it singles her out as the only student not permitted to use a multi-occupancy facility, which is humiliating, ostracizing, and stigmatizing. (Doc. No. 6 at 16). At times, D.H. has not used the restroom at all during the school day, which presents concerns for her health and her ability to focus during the school day. (A.H. Supp. Decl., Doc. No. 36, ¶ 13). The inability to use the girls' restroom also takes time away from learning – the closest single-occupancy restroom to D.H.'s regular classroom is approximately three-times as far from the nearest multi-occupancy restroom to her classroom. (*Id*., ¶ 16).

For their part, the elementary school staff has made efforts to support D.H. at school, and to mitigate the effects of her inability to use the girls' restroom by providing access to several single-occupancy restrooms, providing D.H. a personal key to the restrooms, and explaining to staff that she is allowing to use those facilities, and creating ways for D.H. to use the single-occupancy restrooms as inconspicuously as possible. Indeed, at the end of D.H.'s second-grade year her mother reported that D.H. finished the year with "much improvement," and that she was using the bathroom more and her nightmares had subsided. (Doc. No. 28 (letter from A.H. to principal)). Although her mother reported that D.H. was not using the restroom "at all" at the beginning of this school year, D.H. has not stated why she is not using the restrooms made available during the school day. (A.H. Supp. Decl., Doc. No. 36, ¶¶ 13-14).

Defendants argue that an injunction is not necessary to prevent irreparable harm, because D.H.'s difficulties at school are not entirely related to being unable to use the girls' bathroom and that court-ordered access to the girls' bathroom may serve to exacerbate the ill treatment D.H. has received from other children. While some of D.H.'s difficulties are related to discriminatory treatment and harassment unrelated to her bathroom usage, there is evidence that granting the requested injunction would, at a minimum, mitigate these difficulties, particularly the potential physical harm of not using the bathroom at all or, alternatively, the stress of deciding where and how to use the restroom, and the extra time away from her studies. Although D.H.'s experience in second grade gives reason to hope the adverse impact will lessen as she adjusts to the new year, Plaintiff has provided evidence that she is likely to suffer some harm if not permitted to use the girls' restroom at school.

**D. Balance of Equities & Public Interest**

When the government opposes injunctive relief, the third and fourth elements for a preliminary injunction merge, and the Court must balance any harm with the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiff argues that it is always in the public interest to prevent a violation of constitutional rights and enforce Title IX. (Doc. No. 6 at 24). She adds that Defendants cannot identify any possible harms should the injunction be granted. (*Id.*).

The Williamson County Defendants argue that the Act itself is evidence of the Tennessee General Assembly's determination of Tennessee public policy affording individuals a privacy right not to share a restroom with an individual of the opposite sex (as determined at birth). The Tennessee Defendants raise similar arguments and add that the Court should consider the privacy interests of other students, some of whom have taken issue with D.H.'s use of the girls' restroom. (Doc. No. 30 at 19 (citing A.H. Decl., Doc. No. 7, ¶ 43)).

The Court finds this element is somewhat neutral. As discussed above, Plaintiff has not shown a strong likelihood of success on the merits of her claims, which minimizes the public interest in granting a preliminary injunction.

### III. CONCLUSION

In consideration of the foregoing, the Court finds Plaintiff has not carried her burden to show that the circumstances clearly warrant the extraordinary relief of a preliminary injunction. The factors for a preliminary injunction are a balancing test. Although Plaintiff has shown that she will suffer some degree of harm absent an injunction, the remaining factors counsel against preliminary relief. Importantly, the Court finds Plaintiff has not shown a likelihood of success on the merits of either claim. For these reasons, Plaintiff's motion for preliminary injunction will be denied.

An appropriate Order will enter.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE